UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ARON DIBACCO, et al.,                    :
                                         :
                                         :
        Plaintiffs,                      :
                                         :
    v.                                   :    Civil Action No. 87-3349 (CKK)
                                         :
DEPARTMENT OF THE ARMY,                  :
    et al.,                              :
                                         :
        Defendants

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Come now the plaintiffs, Aron DiBacco and Barbara Webster, and –

move this Court pursuant to Rule 56, Federal Rules of Civil Procedure, for

summary judgment.  A Memorandum of Points and Authorities, a Proposed

Order, and the Declarations of Daniel S. Alcorn, Professor John Newman,

and Carl Oglesby are submitted in support hereof.

Plaintiffs incorporate herein by reference September 14,1998 motion

of Carl Oglesby for Summary Judgment [Dkt 184], and all declarations,

exhibits and attachments thereto, and Oglesby's November 17, 1998

Response to Defendants' Motion for Summary Judgment [Dkt 184[, and all

declarations, exhibits and attachments thereto.

Respectfully submitted,

2

JAMES H. LESAR #114413
1003 K Street, N.W.
Suite 640
Washington, D.C. 20001
Phone:  (202) 393-1921
          (301) 328-5920

Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ARON DIBACCO, et al.,                    :
                                         :
                                         :
        Plaintiffs,                      :
                                         :
    v.                                   :    Civil Action No. 87-3349 (CKK)
                                         :
DEPARTMENT OF THE ARMY,                  :
    et al.,                              :
                                         :
        Defendants                       :
_____:

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFFS'MOTION FOR PARTIAL
SUMMARY JUDGMENT, TO COMPEL FURTHER SEARCHES
TO APPOINT A SPECIAL MAGISTRATE AND IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

STATEMENT OF THE CASE

In 1985 Carl Oglesby, the initial plaintiff in this case, submitted a

Freedom of Information Act ("FOIA") request for records pertaining to

German General Reinhard Gehlen, the Gehlen organization, several Post-

World War II Nazi organizations, and meetings at Fort Hunt, Virginia

between Gehlen and American officials.  During the first nine years of the

case, Oglesby twice appealed to the United States Court of Appeals for the

District of Columbia.  Each of these appeals, Oglesby v. U.S. Dept. of

Army, 920 F.2d 57 (D.C.Cir.1990)("Oglesby I"), and Oglesby v. Dept. of Army, 79 F.3d 1172 (D.C.Cir.1996)("Oglesby II") resulted in remands to the District Court.

Oglesby II held, inter alia, that the Army, Central Intelligence Agency, and National Security Agency had all submitted inadequate Vaughn indices. It also held that the Army and CIA did not provide sufficient information to justify the district court's finding that their searches were reasonably calculated to uncover all responsive documents.  As a result, the Court of Appeals remanded the case for further proceedings to the Army, CIA, and NSA. Id. at 1187

On remand, the parties again cross-moved for summary judgment, and Oglesby sought additional relief, including further searches, discovery, in camera inspection, and appointment of a special master.  Oglesby also moved to stay proceedings pending resolution of a motion he filed for an interim award of attorney fees. Defendants opposed the stay and the motion for interim fees. The motion for interim fees was referred to Magistrate Facciola for a report and recommendation.  Magistrate Faccioloa issued a detailed Report and Recommendation on March 24, 1999, which recommended that Oglesby's counsel be paid $96,864.68 in attorney's fees and costs.

However, defendants filed objections with the District Court, and nearly a year and a half later the District Court rejected the Magistrate's Recommendation and denied the interim fees motion. While noting that defendants "conceded" that plaintiff's "substantial financial hardship and that the case has been pending for a lengthy period of time," the Court found, inter alia, that Oglesby had "failed to sufficiently demonstrate unreasonable delay by the agencies." August 17, 2000 Memorandum Order at 3-4. The Court also found that "the period of time required before the litigation is concluded appears to be "relatively short" and the pending summary judgment motions were the only motions pending before the Court. Id. at 5.

Although the Nazi War Crimes Disclosure Act ("NWCDA") was passed in 1998, defendants took no action to acknowledge the Gehlen-CIA relationship until after the District Court denied interim attorney's fees, putting the pending summary judgment motions back on the front burner. Then, on September 20, 2000, defendants filed the Declaration of William H. McNair ("McNair Decl."), 2000, which informed the Court that earlier that week the Director of Central Intelligence had declassified the existence of the CIA's relationship with the Gehlen Organization ("Gehlen Org"), one of the subjects of Oglesby's request. McNair Decl., ¶¶ 2-3. In response to

Oglesby's request, the CIA had previously refused to confirm or deny the existence of responsive records related to the Gehlen Org. Id.. ¶ 4. The denial was not credible. The relationship was so well-known that a noted American scholar, had written an entire book on the subject entitled <u>General Reinhard Gehlen: The CIA/Nazi Connection</u>.

On November 17, 2000, the District Court issued an order dealing with the implications of the CIA's declassification decision. The Court noted that in light of the CIA's declassification decision, "the government submits that [the CIA] must now (1) reprocess previous releases to plaintiff to determine if any additional information may be disclosed as a result of the declassification and (2) conduct searches within its files for documents responsive to Plaintiff's FOIA request as it relates to General Gehlen and his organization." November 17, 2000 Order citing the October 30, 2000 Defendants' Status Report at 3. The Court further stated that "the CIA does not know how much time will be needed to search, review, and produce documents that are responsive to plaintiff's FOIA request," and that in view of this, it "has requested additional time such that it may complete its search and locate the entire body of documents responsive to plaintiffs FOIA request before filing a report with the Court." The Court also noted that because of the CIA's declassification decision, the

CIA had withdrawn its pending motion for summary judgment and suggested that the declassification also affected the pending summary judgment motions filed by the Army and the NSA. It further noted that Oglesby indicated that his motion might also be moot. Id. In light of this, the Court ordered the government to file a written report not later than December 11, 2000 "setting forth a timetable for the completion of the CIA's processing of [Oglesby's] FOIA request, indicating (1) how much time is needed to complete its review of responsive materials and (2) how much time is needed to procure and file a Vaughn declaration and accompanying motion for summary judgment...." Id.

In the December 11, 2000 Status Report, defendants reported that the CIA had located approximately 251 boxes of materials and 2,901 folders with documents "that likely contain records regarding General Gehlen." It added, it is almost certain that the CIA will locate additional documents concerning General Gehlen as the abovementioned documents are reviewed." It stated that it was currently reviewing documents for release under the NWCDA. It proposed to incorporate the processing of Oglesby's request into the processing of the records to be reviewed under the NWCDA. It asserted that under this plan, "the CIA will release responsive documents to plaintiff as they are released under the

NWCDA, instead of waiting until all documents are processed, as the CIA generally does with FOIA cases." Id. While the CIA stated its intent to process the NWCDA records within a year, it noted that it anticipated locating additional documents which "go beyond the scope of the [NWCDA]" and was also likely to have to process referrals from defendant Department of the Army which it had "received from ... the Department of the Army in the 1980s." These and other complications led defendants to seek two years to complete their review and release of documents and prepare and file a Vaughn index. Id.

The Court held a status conference on January 9, 2001. As a result of that hearing, defendants filed another status report on February 5, 2001. The CIA asserted that it intended to complete processing of the multi-volume file on General Gehlen by the middle of February. It would then forward these files to the National Archives and Records Administration ["NARA] "for third-agency coordination."

The CIA asserted that "[t]his process will need to be followed for all the documents at issue." It further stated that, "[w]hen NARA makes a release of documents, the CIA will receive a final release copy from NARA, and where those documents are Gehlen-related, the CIA will make an interim release to the plaintiff." Defendants also represented that the "CIA

will compile a Vaughn index contemporaneously with its original releases to NARA, thereby saving time. The Vaughn index can then be produced to the plaintiff and filed with the Court soon after the final release is made to the plaintiff."

The status report then described five categories of documents at issue and the searches which it said the CIA would undertake with regard to them. With respect to Category 1, the multi-volume file on Gehlen and numerous files relating specifically to the Gehlen Organization, it indicated the CIA search had identified "a potential universe of over 24,000 responsive documents." With regard to Category 5, which involved "approximately 2200 pages of previous referrals and coordinations from earlier in the litigation that will need to be re-processed," it said that "[t]his declassification effort is complete and voluminous" but "because of the many variables, [it] suggest[ed] that it provide interim status reports on the CIA's progress every four to six months," saying it estimated that this project would take two years to complete. Id., p. 4.

The Court never issued any order adopting or rejecting defendants' plan. It set no schedule governing the interim release of records or the filing of interim Vaughn indices as the CIA represented would file. No Vaughn indices have been filed, no further status reports have been filed, no

declarations have been filed regarding the nature of the searches conducted, and there appear to have been only desultory releases of records over the years.

Judge Norma Holloway Johnson, who was initially assigned to the case and later became Chief Judge, took senior status in 2001 and retired in 2003. Judge Thomas Hogan became Chief Judge in June 2001 and retired in 2008. No judge was ever re-assigned to this case until after Carl Oglesby died and the current plaintiffs were substituted in his place. Defendants refused to agree to their substitution, even though clear precedent in this Court favored it.

The undersigned counsel sought to raise the issue of defendants' need to file a status report in either late 2004 or early 2005, when defendants were represented by AUSA Linda Goldfluss. AUSA Goldfluss also was government counsel in another case handled by the undersigned counsel, Jacqueline Hall v. Department of Justice, Civil Action No. 96-2306. He specifically recalls raising with AUSA Goldfluss the need to file a status report in the Oglesby case during settlement negotiations in the Hall case, she replied that Judge Johnson had retired and that the parties should wait until a new judge was assigned to the case.

The recalcitrant and obstructionist conduct engaged in by defendants in this case was emulated by the CIA in seeking to subvert the War Crimes Disclosure Act ("WCDA") passed by Congress and the efforts of the Inter-Agency Working Group ("IWG") to implement it. Professor John Newman sketches the history of this conduct in the Declaration of John Newman ("Newman Decl.,"), submitted herewith. See id., ¶¶ 4-8.

As Newman notes, the IWG was highly critical of the CIA, calling "preposterous" the CIA's claim that the release of its records which revealed its relationship with foreign nations could harm U.S. relations with foreign governments. Id., ¶ 6. He notes that UN Secretary General Kurt Waldheim's "suspected association with the reprisal killing of hostages, the transportation of victims to concentration and death camps, slave labor, and mistreatment and execution of prisoners of war in Yugoslavia and Greece, and Waldheim's use by the CIA after the war as an intelligence asset or agent led to calls by members of Congress, including Elizabeth Holtzman, for the CIA to share with Congress or to release to the public the information that it had collected on Waldheim." Id., ¶ 5. He further notes that the IWG Final Report "criticized the CIA's performance with respect to the release of these records," saying:

> The agency [CIA] was not forthcoming, and
> withheld these records purportedly to protect
> "foreign government information" and
> "sources and methods." The agency generally
> treated Congressional requests on this matter
> as one CIA staff historian phrased it, with "a
> cavalier attitude." The CIA's unresponsiveness
> led to suspicion that the agency was covering up
> an intelligence relationship with Waldheim or
> that it had certain evidence of his war criminality.

Id., ¶ 6.

This troubling history of the CIA and the NWCDA is not reflected in

the declaration which the CIA's affiant, Martha Lutz ("Lutz affidavit")

submitted in this case to justify the CIA's actions here. Newman states:

> The Lutz affidavit then concludes by jumping
> straight to May 14, 2012, when the CIA provided
> Oglesby' counsel with 7 CDs of CIA records released
> pursuant to the NWCDA. The impression created by
> this terse history of the CIA's handling of declassifica-
> tion of records pursuant to both the Oglesby FOIA
> request and the work of the NWCDA, is a positive pic-
> ture of responsiveness—of a CIA ready and willing to be
> cooperative with private American citizens and their elected
> representatives. The facts clearly demonstrate that, during
> the twenty-seven years in which these events took place, the
> truth was exactly the opposite of that flattering picture. The
> real story is as disappointing as it is disturbing.

Id., ¶ 4.

This history, both the history of this case and the CIA/WCDA history,

should be borne in mind when this Court assesses the credibility of the

representations made by defendants in this case, particularly those of the

CIA.

## ARGUMENT

## I. DEFENDANTS HAVE FAILED TO CONDUCT ADEQUATE SEARCHES

### A. FOIA Search Standard

To prevail in a FOIA case, "the defending agency must prove that

each document that falls within the class requested either has been produced,

is unidentifiable or is wholly exempt from the Act's inspection require-

ments." National Cable Television Ass'n v. FCC. 479 F.2d 183, 186

(D.C.Cir.1973).  Agency affidavits are inadequate where they "do not denote

which files were searched or by whom, do not reflect any systematic

approach to document location, and do not provide information specific

enough to enable [the plaintiff] to challenge the procedures utilized."

Weisberg v. United States Dept. of Justice. 627 F.2d 365, 371

(D.C.Cir.1980)("Weisberg I").

Even if the agency's affidavits are detailed and nonconclusory and are

submitted in good faith, "the requester may nonetheless produce

countervailing evidence, and if the sufficiency of the agency's identification

or retrieval procedure is genuinely in issue, summary judgment is not in

order." Founding Church of Scientology. Etc. v. Nat. Sec. Agcy, 610 F.2d

824, 836 (D.C.Cir.1980). Thus, when countervailing evidence raises a

material doubt as to the adequacy of an agency's search, summary judgment

is inappropriate as to that issue. Id. at 836-837 ("To accept its claim of

inability to retrieve the requested documents in the circumstances presented

is to raise the specter of easy circumvention of the Freedom of Information

Act . . . and if, in the face of well-defined requests and positive indications

of overlooked materials, an agency can so easily avoid adversary scrutiny of

its search techniques, the Act will inevitably become nugatory.").

   It is a truism that the issue "is not whether there might exist any other

documents possibly responsive to the request but rather whether the <u>search</u>

for those documents was <u>adequate</u>." Weisberg v. Department of Justice. 745

F.2d 1476, 1485 (D.C.Cir.1984)("<u>Weisberg III</u>")(emphasis in original),

citing <u>Weisberg v. Department of Justice</u>, 705 F.2d 1344, 1351 (D.C.Cir.

1983)("<u>Weisberg II</u>")(citing <u>Perry v. Block</u>, 684 F.2d 121, 128 (D.C.Cir.

1982) (per curiam); <u>McGehee v. CIA</u>. 697 F.2d 1076, 1101(D.C.Cir.1983).

The test governing the adequacy of an agency's search under the FOIA is

one of "reasonableness." <u>Oglesby v. Department of the Army</u>. 920 F.2d 57,

67 n.13 (D.C.Cir. 1990)("<u>Oglesby I</u>"; <u>Meeropol v. Meese</u>. 790 F.2d 942, 956

(D.C.Cir.1986) ("[A] search need not be perfect, only adequate, and

adequacy is measured by the reasonableness of the effort in light

of the specific request"). Truitt v. Department of State, 897 F2d 540

(D.C.Cir. 1990), expatiated on this standard, stating that: "It is elementary

that an agency responding to a FOIA request must 'conduct[] a search

reasonably calculated to uncover all relevant documents,' and, if challenged,

must demonstrate 'beyond material doubt' that the search was reasonable."

If such "doubt" exists as to the adequacy of the search, Truitt counsels,

"summary judgment for the agency is not proper." Id. (footnote omitted).

In assessing whether an agency has met its burden of showing that no

genuine issue of material fact exists, the facts are viewed "in the light most

favorable to the requester. . . ." Weisberg III, 745 F.2d at 1485.

Where the adequacy of the search is genuine in dispute, the plaintiff is

entitled to take discovery on the adequacy of the search. Weisberg I, 627 .2d

at 371; Exxon Corp. v. Federal Trade Comm'n. 466 F.Supp. 1088, 1094

D.D.C.1978), aff'd 663 F.2d 120 (D.C.Cir. 1980); Van Strum v. U.S. E.P.A.,

680 F.Supp. 849 (D.Ore.1987)("where plaintiff or the agency's response

raises serious doubts as to the completeness and good faith of the agency's

search, discovery is appropriate").

### B. Defendants Have Failed to Conduct an Adequate Search For Records on or Pertaining to Fort Hunt

The second item of Oglesby's request seeks "[r]ecords of the meetings

held at Fort Hunt, Virginia, in the summer of 1946 the aforesaid GEHLEN

and American officials including U.S. Army General GEORGE V.

STRONG and Office of Strategic Services officer ALLEN WELSH

DULLES."  See Complaint, Exhibit 1.  Twelve years after this request was

submitted to all defendants, including the Army, no records have been

located despite the fact that these meetings have been recorded by historians

and a few of those who worked at this ultra-secret facility.

The meetings at Fort Hunt between General Gehlen and U.S. Officials

were held in August or September of 1945 and continued into February

1946. They appear to have involved, on the American side, such senior

officials as Allen Dulles, although there is no definitive evidence on that

point, and Gen. George V. Strong, along with "a retinue of technical experts

and interrogators." Declaration of Carl Oglesby ("Oglesby Decl."), ¶ 5.

[R.84]. It appears that at these meetings Gehlen was tendered certain

promises in exchange for his consent to organize and manage for the United

States an anti-Soviet intelligence network in Europe. "One promise,

evidently, was that he would only engage with Communists and would not

be asked to support the United States denazification efforts. Another was

that he would be required to do nothing that he might regard as against the

interest of sovereign Germany." And a third that when German sovereignty

was restored, he and his organization would be shifted out of U.S. control and would reenter the German government.  Id., ¶ 6.

Given the historical importance of these records, it is anomalous that defendants have produced no records of or pertaining to these meetings. Some of the American officials who took part in the talks with Gehlen have stated on the record that they did so.  Id., ¶ 8, citing John Ranelagh, *The Agency: The Rise and Decline of the CIA* (New York: Simon & Schuster, 1986) as to the participation of OSS officers Sherman Kent and Allen Dulles.  In 1974, Col. William Quinn, U.S. Army (Ret.), described aspects of his participation in the 1945-1946 negotiations with Gehlen to a TV interviewer. Id.  In his book *Gehlen: Spy of the Century* (New York: Random House, 1971), E.H. Cookridge devotes an entire chapter (Chapter X: "The Deal with the Americans") to the negotiations with Gehlen at Fort Hunt.  See Attachment 1 to the Oglesby Declaration.

Moreover, "in documents that the Government has already de-classified or sanitized and released, there are in fact fragmentary but compelling references to the Fort Hunt sessions involving Gehlen." Id., ¶ 9. As Oglesby noted in 1988, "[m]any details of the Gehlen deal have by this time already been declassified, and there is no dispute as to its existence and its general outlines." Id., ¶ 14.

Despite this evidence, "there still exists no published documentary foundation for the belief that the Fort Hunt talks took place and led to certain concrete results." Id., ¶ 10. Mary Ellen Reese's book on General Gehlen reveals that while Gehlen and his men were at Fort Hunt, their quarters were bugged by the Army, and that transcripts of the bugged conversations were made. See *General Reinhard Gehlen: The CIA Connection*, pp. 55, 201 (reproduced as Exhibit 3 hereto). Cookridge, too, reports that Fort Hunt facilities were bugged. Op. cit., p. 126. These records themselves are pertinent to Oglesby's request, and locating them may also lead to the discovery of additional relevant materials. The evidence adduced by Oglesby raises a genuine issue of material fact as to the adequacy of the searches conducted by the defendants.

The evidence provided by Oglesby when he was still living, has now been augmented by new developments in recent years which have cracked open the ubiquitous secrecy which surrounded Fort Hunt for decades. On August 20, 2006, Washington Post staff writer Petula Dvorak ran an article, "A Covert Chapter Opens For Fort Hunt Veterans," which revealed significant new information about the Fort Hunt facility. It was a vast operation in which "100 or so" Military Intelligence interrogators "questioned Third Reich scientists, and soldiers at one of the United States's

most secretive prisoner camps. . . ." See Exhibit 4. The facility was large, was "a major military installation with more than 100 buildings, guard towers and a tangle of electric fences." Id. "The more than 3,400 prisoners who stayed there off the books, too, partly because operations at Fort Hunt 'were not exactly legal' according to the Geneva Conventions, the National Park Service said." Id.

This article confirms through interviews of former employees that the code name P.O. Box 1142 was used for Fort Hunt, as does the obituary of H. George Mandel, a George Washington University professor who interrogated Nazi POWs at Fort Hunt. See Exhibit 5. None of the defendants has stated that a search was conducted under "P.O. Box 1142." Obviously, this is central to any search which approaches adequacy. The Second Declaration of Russell A. Nichols ("Second Nichols Decl.") described the Army's searches but failed to make mention of any search for the Fort Hunt records sought by Oglesby. Nor do the Lutz, Grantham and Murphy declarations submitted on behalf of the CIA, NSA and NARA.

There is clearly a disputed issue of material fact with respect to the Fort Hunt records which defeats defendants' motion for summary judgment. Because of that, this is an issue on which it is appropriate to take discovery.

C. The Army Has Failed to Conduct an Adequate Search

### 1. Defendants' Reliance on the NWCDA Final Report Report is Misplaced

Defendants initially rely on the <u>Nazi War Crimes & Japanese Imperial Government Records Interagency Working Group Final Report to the United States Government (April 2007)</u>("Final Report") to show that the Army conducted a reasonable search for the records sought by Oglesby.  In doing so, they rely on Fed.R.Ev. 803(8) since it was required to be submitted to Congress by P.L. 105-246.  Defendants' Renewed Motion for Summary Judgment filed by the Army, Central Intelligence Agency, and the National Security Agency ("Three Defs. RMSJ") at 4.

Rule 803 provides an exception to the hearsay rule for

(8) Public Records. A record or statement of a public office if:

(A) it sets out:

(i) the office's activities;

(ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or

(iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and

(B) neither the source of information nor other circumstances indicate a lack of trustworthiness.

The Final Report is introduced by a cover letter signed by the

Archivist of the United States, Allen Weinstein, who also chaired the

Interagency Working Group ("IWG").  Dr. Weinstein states in the third

paragraph of that cover letter,

> In order to avoid further delay of the release
> of the report, members of the IWG did not seek
> unanimous agreement on a single "official"
> version of their declassification effort.  Instead this
> report presents the larger issues that arose while
> affording participants an opportunity to present
> personal or institutional perspectives on issues im-
> portant to them and to those whom they represent.
> These appear in a separate chapter at the end of
> the report.

Final Report  at v.

Based on Dr. Weinstein's statement there were disagreements among

IWG members about its work and conclusions.  Thus raising concerns about

the trustworthiness of its Final Report.  Accordingly, the evidence which

defendants seek to rely on is inadmissible.

Defendants' reliance upon statements in the Final Report to establish

the adequacy of the search is also disqualified for a second reason.  Rule

56(e) of the Federal Rules of Civil Procedure provides that affidavits

supporting a motion for summary judgment "shall be made on personal

knowledge, shall set forth such facts as would be admissible in

evidence . . ."  The statements in the <u>Final Report</u> are not made under oath, are not based on personal knowledge, and do not set forth facts admissible in evidence because the hearsay exception cited by defendants does not apply here.

> 2. Defendants Have Used an Incorrect Standard
> to Measure the Adequacy of the Army's Search

Defendants make a general claim that their Statement of Material Facts Not in Genuine Dispute ("Defs' Statement") establishes that the Army and the CIA conducted a reasonable search.  Memorandum of Points and Authorities Submitted by the ARM, CIA, and NSA in Support of Their Renewed Motion for Summary Judgment ("Defs' Memo P&A") at 4. However, defendants' brief does little more than assert that "the Army and CIA searched the files <u>most likely</u> to contain responsive records," from which defendants make the conclusory assertion that they have "thus satis[fied] their FOIA obligations."  <u>Id</u>. (emphasis added)

However, in <u>Oglesby I</u>, the D.C. Circuit laid down a contrary maxim of FOIA search law: "the agency cannot limit its search to only one record system if there are others that are <u>likely</u> to turn up the information requested."  920 F.2d at 68 (emphasis added).  Defendants' mis-representation that limits the required search to the one record system that is "most likely" to contain responsive records rather than requiring a search of

all records systems that are "likely" to turn up such records. This is reflected in Defendants' Exhibit A, where the Final Report describes the "search strategy" for locating Army records responsive to the NWCDA. Exhibit A states that "it was clear that the majority of Army records related to Nazi and Japanese war crimes was clearly in the National Archives[,]" and that "the majority of responsive records remaining in Army custody were classified intelligence and counterintelligence records at the Intelligence and Security Command ('INSCOM') Investigative Records Repository ('IRR')." Exhibit A, Final Report at 52 (emphasis added). The fact that a majority of records may be found in one record system means that up to 49% of the responsive records may be found in other records systems. The exclusion of such other records locations from search does not comply with the holding set forth in Oglesby I.

This flaw in defendants' reliance on the Exhibit A portion of the Final Report is repeated in the Declaration of Bradley S. Dorris ("Dorris Decl.") submitted on behalf of the Army. Dorris asserts that the records of INSCOM's FOIA office indicate that INSCOM provided "all combat and operational files related to World War II, to include Counterintelligence Corps ('CIC') files and any files related to Operation Rusty" to NARA "on or about 26 and 29 September 2000." Dorris Decl., ¶ 4. Dorris does assert,

however that the "[t]he records <u>most likely</u> responsive to the FOIA requests would have been the [IRR] at INSCOM." <u>Id</u>, ¶ 6 (emphasis added). Thus, defendants repeatedly assert, both in their Exhibit A and in the Dorris Declaration, an incorrect standard for conducting a FOIA search.

### 3. The Army's Transfer of Records to NARA Violated Its Obligations Under the FOIA

The Army states that on or about 26 and 29 September 2000 the INSCOM turned its "combat and operational files related to World War II, to include Counterintelligence Corps (CIC") files and any files related to operation Rusty" to NARA. Dorris Decl., ¶ 4. This transfer "included degraded microfilm and now obsolete systems of optical discs, commonly known as 'silver plates.'" <u>Id</u>. The Declaration of Martha Wagner Murphy ("Murphy Decl."), however, states that the Army made the following transfers of records to it:

a. Declassified paper files were transferred to NARA before the Army's microfilm scanning project (which was in response to the NWSDA).

b. In September 2000, "an initial group of 15,700 digitized files from the Investigative Records Repository."

c. In the Summer of 2001, several thousand more "digitalized files and additional paper files."

d. In 2005, the "final load of about 1.3 million scanned microfilm files . . ."

Murphy Decl., ¶ 12. Murphy then asserts that "[d]ue to the fact that the above newly accessioned digitized and scanned files are not open and available to the public in full," NARA conducted a search in 2012 for records responsive to Oglesby's request and located records on eight subjects. Id., ¶ 13. She also indicated that no records were found responsive to other subjects of Oglesby's request, such as "alleged" meetings at Fort Hunt, Virginia, in the summer of 1945 between American officials, including U.S. Army General George V. Strong and OSS officer Allen Welsh Dulles. Id., ¶ 14. She indicated that these records would be made available to Oglesby (and other requesters) upon submission of new requests and agreement to pay copying charges imposed by NARA. Id., ¶18.

Generally, "an agency has no duty to retrieve and release documents it once possessed but that it legitimately disposed of prior to the date a FOIA request was received." McGehee v. CIA, 697 F.2d 1095, 1103 n.33 (D.C. Cir. 1983) (construing Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 155 n.9 (1980))(first emphasis added) reh'g granted and vacated in part in other respect, 711 F.2d 1076 (D.C. Cir.1983). However, as noted in Chambers v. Dept. of the Interior. 568 F. 3d 998. 1004

(D.C.Cir. 2009) "[n]onetheless, as the italicized language suggests . . . . an agency is not shielded from liability if it intentionally transfers or destroys a document after it has been requested under FOIA or the Privacy Act[,] citing "[s]ee Forsham v. Califano, 587 F.2d 1129. 1136, n.19 (D.C.Cir.1978)("We do not suggest that mere physical possession of records by a government agency is the sole criterion for determining whether they fall within the scope of FOIA.  Obviously a government agency cannot circumvent FOIA by transferring physical possession of its records to a warehouse or like bailee."), *affd,* Forsham v. Harris, 445 U.S. 169 (1980); cf Kissinger, 445 U.S. at 155 n.9 ("There is no question that a [FOIA] 'withholding' must here be gauged by the time at which the request is made since there is no FOIA obligation to retain records prior to that request.

In this case, the transfer of Army records occurred after—some 15 to 20 years after—after Oglesby's FOIA request.  This violation of the law was made even more flagrant by the fact that Army documents responsive to Oglesby's request, were, according to the Dorris Declaration, transferred to NARA on September 26 and 29, 2000, less than a week after defendants filed the McNair Declaration giving notice that the CIA's relationship with Gehlen had been declassified the previous week. (A copy of the Notice of Filing of the McNair Declaration is Exhibit 1 hereto.)  Defendants did not

inform the Court that Army was already planning to move records responsive to Oglesby's request to NARA even though there were pending cross-motions for summary judgment before the Court.

More than a month later, on October 31, 2000, defendants filed a Status Report which acknowledged that the declassification of the Gehlen relationship would also impact the Army and the NSA. "The Army realizes that the CIA's determination to declassify the relationship between the U.S. Government and the Gehlen Organization will affect it. The Army will have to review responsive materials resulting from the CIA'S declassification decision." See Exhibit 2, Defendants Status Report filed October 31, 2000.

Thus, the evidence here goes beyond the issues raised in the above line of cases. It presents the issue raised in Judicial Watch, Inc. v. U.S. Dep't of Commerce, 34 F.Supp.2d 28 (D.C.Cir.1998), where, a "magistrate judge [was directed] to preside over discovery 'designed to explore the extent to which [Department of Commerce] . . . illegally destroyed and discarded responsive information, and possible methods for recovering whatever responsive information still exists outside of the DOC's possession'"). Chambers at 1004, quoting Judicial Watch at 441; and citing Legal Found, v. EPA, 272 F. Supp. 2d 59, 62 (D.D.C. 2003) (noting

that earlier in litigation court had held U.S. Environmental Protection in contempt and ordered it to pay plaintiff's costs and fees "caused by EPA's contumacious conduct, namely, destroying potentially responsive material contained on hard drives and email backup tapes"). Both discovery and reimbursement of attorney fees and costs are appropriate in the circumstances presented by this case.

### 4. The Army's Searches Prior to the Official Public Disclosure of Gehlen's Relationship with the CIA Were Deeply Flawed

In 1997, after the second remand by the Court of Appeals, defendants Army, CIA and NSA moved for Summary Judgment, and this motion was pending when the CIA officially revealed its long-known relationship with General Gehlen. The Army submitted declarations in support of its claim to have conducted an adequate search. Although the Third Declaration of Russell A. Nichols recited at great length the files maintained by the Army's IRR it left basic questions unanswered. For example, it was by no means clear records of the Fort Hunt meetings would necessarily be classified as "intelligence records and thus stored at the IRR, much less indexed in one of its several different indices. For example, Nichols stated that when the IRR came into existence in 1951 as the Army's centralized intelligence records holding facility, intelligence investigative records from over 20 locations within the continental United States were transferred to the IRR at Fort

Holabird, Maryland.  Second Nichols Decl., ¶ 4.  He did not say that Fort

Hunt's records were among those transferred to Fort Holabird.  Nor is it clear

that the records of the Fort Hunt meetings would necessarily have been

classified as "intelligence investigative records" or that their existence would

have been admitted at all.  Rather, at least until the CIA's public revelation

of the Gehlen-CIA relationship, they simply may not have been

acknowledged at all.  Or they may have been considered as not being

intelligence investigative records but as records related to a different matter,

negotiations between the United States and General Gehlen and his

associates.

The affidavits submitted by Nichols fail to state that all components

which likely to hold records responsive to Oglesby's were transferred to the

IRR when it was created in 1951—or thereafter.

The Mary Ellen Reese Documents

Oglesby II took note of the fact that Mary Ellen Reese said in her

book on Gehlen that she had received "well over a thousand documents"

from Army Intelligence in response to her FOIA requests.  Id, 79 F.3d at

1185.  As the Court of Appeals noted, this raised questions about the

adequacy of the Army's search.  Although in connection with defendants'

1997 summary judgment motion the Army provided a very lengthy

declaration outlining its file locations and indexing systems, there are two problems that remain. First, the Army did not state that these are the only records systems and indices that might be pertinent to Oglesby's requests. Second, it failed to explain why its searches located more records responsive to Reese's requests than they did for Oglesby's. Obviously, this could be explained by the different wording of Reese's requests. But in order to make this determination, this Court and Oglesby need to see the requests submitted by Reese and be given a detailed explanation of how the searches were made.

### 5. Failure to Search All Appropriate Terms and Locations

The search conducted by the Army failed to include all terms that should have been searched. For example, the Army released records which make it clear that "GO" was used as an abbreviation for "Gehlen Organization." See Exhibit 6. Yet there is no indication that any search was conducted under this term, either by Army or the CIA or any of the other defendants.

There is no showing that any search was ever made using the term "P.O. Box 1142." Now that the secrecy regarding the CIA relationship with Gehlen has ended, there is no justification for not seeking a search of this term, not only by the Army, but, the CIA, NSA and NARA as well.

The documents also reflect distribution of multiple copies, including to other units. There is no indication that these other units were searched for either the copies or other possibly related documents.

### D. The CIA Has Not Met Its Burden of Proof on the Search Issue

At issue in this case is not defendants' response to the NWCDA but defendants' response to the Court of Appeals remand in 1996 requiring them to conduct further searches, etc. The CIA's Lutz Declaration sheds no light on this. Back in 2000 and 2001, as a consequence of the CIA's belated concession that it had had a relationship with Gehlen, the CIA filed a number of status reports which claimed a great deal was being done to conduct new searches, prepare Vaughn indices and the like.

The CIA's December 11, 2000 Status Report said that the CIA had located approximately 251 boxes of materials and 2,901 folders with documents "that likely contain records regarding General Gehlen." It added, "it is almost certain that the CIA will locate additional documents concerning General Gehlen as the above mentioned documents are reviewed." While stating its intent to process the NWCDA records within a year, it noted that it anticipated locating additional documents which "go beyond the scope of the [NWCDA]" was likely to have to process referrals

from . . . the Army which it had "received from the Army in the 1980s. Id. There are other such representations. See infra. pp. 4-8.

The Lutz Declaration makes no attempt to correlate these files with what is contained in the CD ROMs that have been provided, and plaintiffs have no way of knowing. But the clear implication of the "beyond the scope" language is that there may be responsive files which are not NWCDA records. There must be a clear accounting of what responsive records the CIA located through its FOIA searches for records on Oglesby, apart from whatever it located through the NWCDA searches.

Oglesby's 1998 Cross-Motion for Summary Judgment noted that the CIA had offered "no explanation why the records of the Directorate of Intelligence was not searched. Nor has any explanation been given as to why many other subcomponents of these directorates were not searched, such as the Office of Legal Counsel and the Directorate of Personnel (in the Directorate of Administration), the International Branch, the Central Biographic Division, the Office of National Estimates, the Office of Finances, the Office of Inspector General, and the various pertinent geo-graphical divisions (Soviet Russia, Western Europe, Easter Europe, Caribbean)." 1998 Cross-Motion for Summary Judgment at 11-12.

There is nothing in the Lutz Declaration which indicates that such components were searched.

Additionally, in Oglesby's 1998 CMSJ he challenged the CIA's "Glomar" defense. By claiming to have processed everything under the NWCDA, the CIA has avoided indicating whether it still invokes the "Glomar" refusal to confirm or deny defense. The mere fact that it has admitted to the Gehlen-CIA relationship does not mean that the CIA has foresworn the "Glomar" defense for other records that may be relevant to his request.

The CIA also responded to Oglesby's request by stating that a search had been conducted "pursuant to the FOIA and the CIA Information Act of 1984." This is the CIA's Orwellian language used to conceal the fact that it had not in fact conducted a search of operational files. The CIA needs to make clear whether under the FOIA it has conducted a search of operational files, and whether all such operational files were released under the NWCDA and provided to Oglesby.

## II. DEFENDANTS HAVE FAILED TO SHOW ENTITLEMENT TO EXEMPTION 1, 5 U.S.C. § 552(b)(1)

Exemption 1 to the FOIA exempts from mandatory disclosure matters that are

> (1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and

> (B) are in fact properly classified pursuant to such Executive order;

The records at issue are at their youngest well over half a century old, and the oldest nearly 70 years of age. The Lutz Declaration which the CIA proffers in support of its Exemption 1 claims, fails to show how these documents relate to any current national security or foreign policy concerns. German is now a sovereign state, a member of NATO at peace with the United States and those who were its former enemies during World War II. The national security concerns which were present during and immediately following World War II are simply not present now, where concerns arising from Iraq, Afghanistan and Al Queda dominate.

That having been said, the preeminent issue raised by the CIA's Exemption 1 claims is which Executive Order is the proper one to apply to this case.

A. The Proper Executive Order is E.O. 13526, Not E.O. 12958

The Guide to the Freedom of Informatin Act ("OIP Guide") published by the U.S. Justice Department's Office of Information Policy

(OIP) states that "[u]nder the precedents established by the United States
Court of Appeals for the District of Columbia Circuit, the accepted rule is
that a reviewing court will accept the propriety of Exemption 1 withholdings
under the executive order in effect when the agency's ultimate classification
decision is ultimately made." Id. (2009 edition) at 143, citing King v. U.S.
Dept. of Justice, 830 F.2d 210, 217 (D.C.Cir. 1987). The OIP Guide
continues: "Only when a reviewing court contemplates remanding the case
to the agency to correct a deficiency in its classification determination is it
necessary to apply the standards of a superseding executive order." Id.
(footnotes omitted). D.C. Circuit cases have consistently held that where a
case has been remanded to district court, review should occur under the new
executive order. See, e. g., Campbell v. U.S. Dept. of Justice, 164 F.3d 20
(D.C. Cir.1998)(when court remands to agency for review of classification,
such review is performed under superseding executive order; applying
Executive order 12,356 to records at issue, but noting that Executive order
12,598 would apply if court 'found that the agencies improperly withheld
information pursuant to Exemption 1');

On the face of it, this issue of which Executive Order to apply in
assessing the damage to national security would seem to be relatively
simple. The information at issue is 50 to 70 years old; the very last of the

many Executive orders which were in effect during this period of time, E.O. 12958, expired four years ago. The CIA affiant can address the issue in a very direct and straightforward manner, declaring that she has reviewed the withheld information and personally has determined that identifiable damage to national security could reasonably be expected to occur if the withheld materials were disclosed.

But the CIA's affiant, Martha Lutz, did not perform the simple, clear and direct analysis required. Professor John Newman has. Newman is Adjunct Professor in Political Science at James Madison University in Harrisonburg Virginia. For the past thirty years he has worked for the University of Maryland system, the last nineteen years with the Honors College at the University of Maryland at College Park. He served for twenty-one years in U.S. Army Intelligence (1974-1994), during which he was the Assistant to the Director, National Security Agency, 1988-1990. He has been called before various Congressional committees to offer judgments on matters pertaining to the public release of classified documents. In 1994, he was called before the US House of Representatives Committee on Government Operations to discuss CIA compliance with the JFK Records Act of 1992. Declaration of Prof. John Newman, ¶ 1.

Newman finds Lutz's statements regarding E.O. 12958 and 13526 to be a "model of confusion," noting that she "makes reference to Section 3.3 (b) when actually quoting directly from automatic declassification provisions from Section 3.4." Id., ¶ 17, citing Lutz Decl., ¶ 28. Then, moving back into the past, the affidavit admits that the above categories of information were in fact released under the NWCDA, and it also acknowledges that the Executive Order in force at the time the CIA reviewed the records requested by Oglesby was, in fact, E.O. 12958. That was more than a decade ago. Then, jumping back into the present, the affidavit's author states this: "I have determined that the information withheld from the listed documents as exempt pursuant to (b) (1) is *currently* properly classified." [My italics]  What the author fails to state is that the Executive Order *currently* in force is not E.O. 12598.   Newman Decl., ¶ 17. Newman continues:

> Take, for example, the Lutz Declaration's reference to E.O. 12958 on pp. 11-12. Here, speaking in the present, the Lutz affidavit states that the CIA claims FOIA exemptions to withhold CIA records which would reveal "intelligence sources *and methods, overseas CIA installation(s), cryptonyms, pseudonyms, names and signatures of CIA employees, internal CIA organizational information and CIA file markings.*" The affidavit acknowledges that the reason that the FOIA does not apply to such sources and methods is because these sources and methods are specifically allowed to be kept secret by Executive Order.

Id., ¶ 18 (italics in original).

> Then, moving back into the past, the affidavit
> admits that the above categories of information were
> in fact released under the NWCDA, and it also acknow-
> ledges that the Executive Order in force at the time the
> CIA reviewed the records requested by Oglesby was, in
> fact, E.O. 12958.  That was more than a decade ago.
> Then, jumping back into the present, the affidavit's author
> states this: "I have determined that the information with-
> held from the listed documents as exempt pursuant to (b)
> (1) is *currently* properly classified." * * *  What the author
> fails to state is that the Executive Order *currently* in force is
> not E.O. 12598.

Id., ¶ 19.

While Lutz gives the impression she is applying E. O. 13526, the

determinations she relies upon, at least insofar as the NWCDA records are

concerned, is the only determinations made with regard to these records

were made under E.O. 12958.  And although Lutz also gives the impression

that the two orders do not differ significantly in terms of what information

must be disclosed, this is not true.

The preamble to Executive Order 13526 states in part: "Our

democratic principles require that the American people be informed of the

activities of their Government."  The FOIA specifies that information sought

by requesters is to be provided "promptly."  These considerations make it

clear that E.O. 13526 is the executive order which should be applied in this

case at this point. This is also made plain by the terms of E.O. 13526 itself.

As Prof. Newman points out:

> [E.O. 13526 requires the CIA to ensure that its
> fundamental classification guidance *"reflects
> current circumstances and to identify classified in-
> formation that no longer requires protection and
> can be declassified. The initial declassification
> guidance review shall be completed within two
> years of the effective date of this order).* [E.O.
> 13526, Section 1.9 (a)]....

Newman Decl., ¶20. "Current circumstances" tilt ineluctably and

irretrievably in favor of the present application in this case of E.O. 13526,

not E.O. 12598.

### B. There Are Profound Differences Between the Disclosure Standards Under E.O. 12958 and Those Prescribed by By E.O. 13526

Section 1.6(d) of E.O. 12958 exempts nine categories of information

from automatic declassification after 25 years; namely, matters that should

be expected to:

(1) reveal the identity of a confidential human source, or reveal

information about the application of an intelligence source or method, or

reveal the identity of a human intelligence source when the unauthor-

ized disclosure of that source would clearly and demonstrably damage

the national security interests of the United States ;

(2) reveal information that would assist in the development or use of weapons of mass destruction;

(3) reveal information that would impair U.S. cryptologic systems or activities;

(4) reveal information that would impair the application of state of the art technology within a U.S. weapon system;

(5) reveal actual U.S. military war plans that remain in effect;

(6) reveal information that would seriously and demonstrably impair relations between the United States and a foreign government, or seriously and demonstrably undermine ongoing, diplomatic activities of the United States;

(7) reveal information that would clearly and demonstrably impair the current ability of United States Government officials to protect the President, Vice President, and other officials for whom protection services, in the interest of national security, are authorized;

(8) reveal information that would seriously and demonstrably impair current national security emergency preparedness plans, or

(9) violate a statute, treaty, or international agreement.

By contrast, E.O. 13526, § 3.4(h) provides

(1) Records that contain information the
    release of which should clearly and demonstrably

be expected to reveal the following are exempt
from automatic declassification at 50 years

(A) the identity of a confidential human source
or a human intelligence source; or

(B) key design concepts of weapons of mass
destruction.

(2) In extraordinary cases, agency heads may, within 5
years of the onset of automatic declassification,
propose to exempt additional specific information
from declassification at 50 years.

In essence this reduces the categories from nine sometimes complex

categories under E.O. 12958 to just one under E.O. 13526.

C.  The CIA's Vaughn Index Is Insufficient

As explicated in Founding Church of Scientology of Washington D.C.

v. Bell, 603 F .2d 945, 949 (D .C .Cir .1979), there are "three indispensable

elements" of a Vaughn index:

(1) The index should be contained in one document, complete in
itself.

(2) The index must adequately describe each withheld document or
deletion from a released document.

(3) The index must state the exemption claimed for each deletion or
withheld document, and explain why the exemption is relevant. Of course
the explanation of the exemption claim and the descriptions of withheld
material need not be so detailed as to reveal that which the agency wishes to
conceal, but they must be sufficiently specific to permit a reasoned judgment
as to whether the material is actually exempted under FOIA.

Mr. Daniel S. Alcorn, who is co-counsel in this case, reviewed the Vaughn index attached to the Lutz Declaration, which was filed as Exhibit E to defendants' Renewed Motion for Summary Judgment. Declaration of Daniel S. Alcorn, ¶ 2. He compared that index with documents provided to plaintiffs by government counsel that related to Dr. Reinhard Gehlen, one of the subjects of Oglesby's request. These documents are contained on DVD disc #5, folder #126 (four volumes) and folder #127 (three volumes). Id.

Mr. Alcorn asserts:

> When I began to compare the Vaughn index with the Gehlen documents on the DVD disc I immediately encountered a problem with matching the document described in the Vaughn index with the documents on the DVD disc. The problem is caused by the fact that apparently the Vaughn index serially numbers pages in documents within each volume, whereas the DVD disc serially numbers documents within each volume, regardless of how many pages are in the document. On the DVD disc each document of however many pages is saved as a separate PDF file and each such document is number serially, 1, 2, 3, etc. Thus the page numbers cited by the Vaughn index do not match the document numbers on the DVD disc, and it is not possible to locate a document referred to in the Vaughn index by comparing the numbers on the Vaughn index with the numbers on the DVD disc documents.

Id., ¶ 4. It is apparent from this description that the index provided by the CIA is of no use in providing the kind of analysis which plaintiffs and the Court need to be able to make in order to carry out their responsibilities in this case.

### III.  The CIA Has Not Met Exemption 3

#### A.  The CIA No Longer Has Power Alone to Protect Intelligence Sources and Methods Without Approval of the DNI

The CIA invokes the power of the Director of Central Intelligence ("DCI") to protect against the unauthorized disclosure of intelligence sources and methods.  However, this power now resides with the Director of National Intelligence ("DNI"), and 50 U.S.C. § 403-1(i)(3) provides that: "The Director [of National Intelligence] may only delegate a duty or authority given the Director under this subsection to the Principal Deputy Director of National Intelligence." (emphasis added)

The obvious reason for limiting the power of the DNI to delegate his authority to protect intelligence sources and methods was to curtail unnecessary secrecy by limiting the number of officials who can wield that power.  This is made clear by the legislative history.  Congress-woman Jane Harman, who was a manager of the Intelligence Reform and Terrorism Protection Act of 2004, and a member of the Conference Committee on the legislation, noted the key features of the pending legislation, stated that the bill before the House of Representatives

> deals with the consolidation of power within the DNI to protect intelligence sources and methods. Members of the public have expressed concern that

the increased authority of the Director of National Intelligence could be abused to constrict the free flow of information that is critical to our duties in the Congress and that the authorities under this bill might be used, or abused, to unduly limit the flow of information to the State and local governments and to the public.

The purpose of this bill is to facilitate the dissemination of information within government. There is no intention on the part of the Congress to impair the appropriate and desirable flow of information. This bill does not contain any authority for the DNI or the President to establish a regime of undue government secrecy. The bill vests the DNI with the authority to protect intelligence sources and methods, just as the Director of Central Intelligence has exercised that authority.

150 Cong. Rec., H.10994, 108th Cong., 23d Sess. (Dec. 7, 2008) (statement

of Rep. Harman)(emphasis added).

As the underscored passages indicate, this bill concerned the

"consolidation of Power within the DNI to protect intelligence sources and

methods," not its delegation to officials from other government agencies.

The bill "vest[ed] the DNI with the authority to protect intelligence sources

and methods," not some other agency. The intent in so doing was to prevent

government agencies from "unduly limit[ing] the flow of information to

State and local governments and to the public." There was "no intent on the

part of Congress to impair the appropriate and desirable flow of informa-

tion." Permitting a multitude of government officials to exercise the power

to protect intelligence source and methods, would undercut these congressional goals.

CONCLUSION

For the reasons set forth above, defendants' cross-motion for summary judgment should be denied and that of plaintiffs granted. This Court should permit plaintiffs to take discovery on the search issue and issue an order directing further searches. It should further order reexamination of all classified materials under Executive Order 13526. As to those issues where there are genuine issues of material fact in dispute, it should deny the parties' motions and permit plaintiffs to proceed with discovery on the search issue.

Respectfully submitted,

_____
JAMES H. LESAR #114413


1003 K Street, N.W.
Suite 640
Washington, D.C. 20001
Phone:  (202) 393-1921
        (301) 328-5920

Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ARON DiBACCO, et al.              :
                                  :
        Plaintiffs                :
                                  :
    v.                            :     Civil Action No. 87-3349 (CKK)
                                  :
U. S. DEPARTMENT OF THE           :
    ARMY, et al.,                 :
                                  :
        Defendants.               :

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to LCvR 7(h)(1), the substituted plaintiffs, DiBacco and Webster, submit in support of their motion for summary judgment this statement of material facts as to which there is no genuine issues.

1. The facts set forth in the following paragraphs defendants' Statement of Material Facts are not in dispute: paragraphs numbered 1-7, 14. 30, 40-41, 50. and 52-53.

2. The Executive Order currently governing national security classification is E.O. 13526. Declaration of John Newman.

3. The documents at issue in this case are more than 50 years old. Id. ¶ 20.

4. The Army's transfer of records to the National Archives and Records Administration ("NARA") while the 1996 remand order of the United States Court of Appeals was pending in District without having conducted a search under the FOIA for records responsive to Oglesby's request violated the FOIA.

5. The Army, CIA, and NARA have not conducted a search for records pertaining to the meeting between Reinhard Gehlen and American officials using the code word for the military facility there, "P.O. Box 1142.

6. The Declaration of Martha Lutz does not indicate whether the CIA is still relying on its "Glomar" defense in response to Oglesby's FOIA request.

7. The Declaration of Martha Lutz does not indicate whether or not the CIA is refusing to searach for operational files containing records responsive to Oglesby's FOIA request.

Respectfully submitted,

James H. Lesar #114413
1003 K Street, N.W.
Suite 640
Washington, D.C. 20001
Phone: (202)393-1921
Attorney for Plaintiff