# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ARON DIBACCO, *et al.*,<br><br>    Substitute Plaintiffs for Carl Oglesby,<br><br>        v.<br><br>U.S. DEPARTMENT OF THE ARMY, *et al.*,<br><br>    Defendants. | **Civil Action No. 87-3349 (CKK)** |

## MEMORANDUM OPINION
(September 26, 2013)

Carl Oglesby filed suit in 1987 challenging several agencies' responses to a Freedom of Information Act ("FOIA") request Mr. Oglesby submitted in August 1985. Since that time, the case has reached the United States Court of Appeals twice then lay dormant for nearly eleven years. In December 2011, Aron DiBacco and Barbara Webster, the domestic partner and daughter of the now-deceased Mr. Oglesby, sought to replace Mr. Oglesby as the Plaintiffs in this action, which the Court permitted. Only three issues remain for the Court to resolve: (1) whether the National Security Agency has submitted an adequate *Vaughn* index; (2) whether the Central Intelligence Agency and United States Department of the Army conducted an adequate search for potentially responsive records; and (3) whether the CIA and the Army properly invoked certain FOIA exemptions. Upon consideration of the pleadings,[1] the relevant legal

---

[1]    The Court's analysis focused on the following documents, in chronological order according to motion: (1) Defs.' Renewed Mot. for Summ. J. ("Defs.' Mot."), ECF No. [240]; Pls.' Opp'n & Cross-Mot. for Summ. J. ("Pls.' Mot."), ECF No. [241]; Parties' Notices of Filing, ECF Nos. [243, 244]; Defs.' Reply & Opp'n to Cross-Mot. ("Defs.' Reply"), ECF No. [246]; Pls.' Reply, ECF No. [248]; Defs.' Sur-Reply, ECF No. [254-1]; (2) Pls.' Mot. to Compel, ECF No. [249]; Defs.' Opp'n, ECF No. [251]; Pls.' Reply, ECF No. [252]; (3) Defs.' Mot. for Leave

authorities, and the record as a whole, the Court finds the Defendants have met their burden to show, through detailed declarations and *Vaughn* indices, that the CIA and the Army conducted adequate searches for responsive records, and that the NSA, the CIA, and the Army properly withheld certain information pursuant to various FOIA exemptions. Accordingly, the Defendants' [254] Motion for Leave to File Sur-Reply is GRANTED; the Plaintiffs' [249] Motion to Compel Disclosure of *Ex Parte* Declarations is DENIED; the Defendants' [240] Renewed Motion for Summary Judgment is GRANTED; and the Plaintiffs' [241] Cross-Motion for Summary Judgment is DENIED.

## I. BACKGROUND

> Since the early 1970s, [Carl] Oglesby has relentlessly pursued the story of General Reinhard Gehlen, who served as chief of a Nazi spy ring during World War II and who allegedly later negotiated an agreement with the United States which allowed his spy network to continue in existence despite post-war de-nazification programs. After World War II, his group, then known as the Gehlen Organization, was reportedly reconstituted as a functioning espionage network under U.S. command. According to Oglesby, control of the Gehlen Organization shifted back to the newly-sovereign West German Federal Republic as the BND (for Bundesnachrichtendienst, or "the Federal Intelligence Service") after ten years of U.S. control.

*Oglesby v. U.S. Dep't of Army* ("*Oglesby II*"), 79 F.3d 1172, 1175 (D.C. Cir. 1996). To that end, between August 21 and September 19, 1985, Carl Oglesby submitted nearly identical Freedom of Information Act requests to the Central Intelligence Agency, the United States Departments of the Army and State, the National Security Agency, the Federal Bureau of Investigation, and the National Archives and Records Administration ("NARA"). *Oglesby v. U.S. Dep't of Army* ("*Oglesby I*"), 920 F.2d 57, 60 (D.C. Cir. 1990). "[W]ith minor variations," Oglesby sought the following records from each agency:

---

to File Sur-Reply, ECF No. [254]; Pls.' Resp., ECF No. [255].

(1) records on General Gehlen during the period 1944 through 1956;

(2) records on meetings held at Fort Hunt, Virginia, in the summer of 1945 between General Gehlen and U.S. Army General George Strong and Office of Strategic Services ("OSS") officer Allen Dulles;

(3) records on the U.S. Army's "Operation Rusty," carried out in Europe between 1945 and 1948;

(4) records on post-war Nazi German underground organizations such as "Odessa," "Kamaradenwerk," "Bruderschaft," "Werewolves" and "Die Spinne";

(5) records on the OSS's "Operation Sunrise" carried out in 1945; and

(6) records on Gehlen's relationship with William J. Donovan and Allen Dulles of the OSS, records on Operation Rusty and Gehlen collected by the Central Intelligence Group ("CIG"), and records on the Nazi underground organization "La Arana."

*Id.* The agencies released a total of 384 pages, many with redactions, but withheld other responsive documents. *Id.* The Army, CIA, NARA, and NSA denied Mr. Oglesby's request for a fee waiver. *Id.* at 61.

Mr. Oglesby filed suit on December 11, 1987. The District Court, per Judge Norma Holloway Johnson, granted summary judgment in favor of the Defendants. 5/22/1989 Mem. Op. & Order. On appeal, the D.C. Circuit found that Oglesby had failed to exhaust his administrative remedies with respect to his requests to the Army, CIA, FBI, NSA, and NARA, but had constructively exhausted his administrative remedies concerning his request to Department of State. *Oglesby I*, 920 F.2d at 59-60. The court remanded the case, instructing Oglesby to exhaust his remedies, and leaving for the District Court the issue of whether the Department of State conducted an adequate search in response to Oglesby's request. *Id.*

Following the *Oglesby I* decision, Oglesby exhausted his administrative remedies, and once again challenged the Defendants' responses. *Oglesby II*, 79 F.3d at 1176. The District Court granted summary judgment in favor of the Defendants, concluding that each Defendant

agency conducted an adequate search for documents and properly withheld information pursuant to various FOIA exemptions. *Id.* Mr. Oglesby appealed, challenging (1) NARA's refusal to grant Oglesby a fee waiver; (2) the adequacy of the searches conducted by the Army, CIA, FBI, NSA, and State Department; (3) the adequacy of the *Vaughn* indices submitted by the Army, CIA, and NSA; and (4) the CIA's and Army's withholding of certain responsive documents. *Id.* at 1175. The D.C. Circuit agreed that the CIA and the Army failed to show they conducted adequate searches, and that the CIA, Army, and NSA failed to adequately justify their withholdings. *Id.* The court affirmed the District Court in all other respects. *Id.* Upon remand, the Army, CIA, and NSA eventually filed a renewed motion for summary judgment. 9/25/97 Mot. for Summ. J., ECF No. [129]. Just short of one year later, Oglesby filed an opposition to the Defendants' motion and cross-moved for summary judgment. 9/14/98 Cross Mot., ECF No. [176].[2]

On October 8, 1998, President William Clinton signed into law the "Nazi War Crimes Disclosure Act," or "NWCDA." P.L. 105-246, 5 U.S.C. § 552 note. The act "required the U.S. Government to locate, declassify, and release in their entirety, with few exceptions, remaining classified records about war crimes committed by Nazi Germany and its allies." Nazi War Crimes & Japanese Imperial Gov't Records Interagency Working Group ("IWG" or "the working group"), Final Report to the United States Congress 1 (Apr. 2007). To oversee the implementation of NWCDA and the Japanese-Imperial Government Disclosure Act of 2000, the President created an Interagency Working Group, consisting of the Archivist of the United States, designated representatives of the FBI, the CIA, the National Security Council, the U.S.

_____

[2] Pleadings and orders submitted prior to 2006 are not on the electronic docket, but can be located in the case file maintained by the Clerk of Court.

Holocaust Memorial Museum, and the Departments of Defense, Justice, and State, as well as three public members. *Id.* Although General Gehlen is not considered a Nazi war criminal, "the CIA pledged to acknowledge the intelligence relationship with General Gehlen in records processed for release under the [NWCDA]." *Id.* at 48. Accordingly, "the CIA approved the release of the 2,100-page Army Gehlen file, and in addition released nearly 2,100 pages of materials relating to Gehlen from its own files as well as files on many of Gehlen's personnel and agents—including the operational information in all of these files." *Id.*

While the parties' cross-motions were pending, the Defendants submitted a declaration from William H. McNair, the Information Review Officer for the Directorate of Operations for the CIA, indicating that the Director of Central Intelligence declassified the relationship between the United States Government and the Gehlen Organization. Pls.' Opp'n, Ex. 1 (McNair Decl.) at ¶ 9. In light of the declassification, the CIA indicated it needed to reprocess its previous releases to Oglesby and its referrals to the CIA from other agencies "because additional information may now be appropriate for release." 10/31/00 Status Report, ECF No. [211], at 3. Unsure of what effect the declassification might have on the Defendants' motion for summary judgment with respect to the NSA and the Army, the Defendants withdrew the pending motion for summary judgment. *Id.* at 6. Oglesby noted that his cross-motion may also be moot due to the classification. 11/17/00 Order, ECF No. [214], at 2. The Court thus ordered the Defendants to file a status report by no later than December 11, 2000, indicating "how much time is needed to complete its review of responsive material" and "how much time is needed to prepare and file a *Vaughn* declaration and accompanying motion for summary judgment." *Id.*

Pursuant to the Court's November 2000 Order, the Defendants submitted a status report indicating that "recent CIA searches conducted in response to the portion of the plaintiff's FOIA

request regarding General Gehlen have resulted in locating approximately 251 boxes of material, and 2,901 folders, with documents that likely contain records regarding General Gehlen."[3] 12/11/00 Status Report, ECF No. [215], at 1-2. The Defendants explained that "CIA reviewers processing documents for release under the NWCDA [would] be most familiar with the material at issue in plaintiff's FOIA request," therefore the CIA proposed "incorporate[ing] the processing of plaintiff's FOIA request into the processing of the documents to be reviewed pursuant to the NWCDA." *Id.* at 2. The Defendants suggested this approach would benefit Mr. Oglesby because "the CIA [would] release responsive documents to the plaintiff as they [were] released under the NWCDA, instead of waiting until all documents are processed," as was the CIA's general procedure in FOIA cases. *Id.* The Defendants estimated that the processing of all responsive documents under the NWCDA would be completed 'within a year," but that "additional documents that go beyond the scope of the Act—which the CIA anticipates locating—will also need to be processed." *Id.* Accordingly, the CIA requested two years in which to complete its review of documents and to file a *Vaughn* index. *Id.* at 3. The parties discussed many of the issues raised in the Defendants' status report during a status hearing on January 9, 2001. Noting that many of the documents were likely to be in German and thus need translating before processing, the Court asked the Defendants to submit a further status report in approximately three weeks. 1/9/01 Tr. 18:21-19:2. The Court anticipated that the Defendants would file additional status reports as the documents were being processed, but advised Plaintiffs' counsel that if he was dissatisfied with the pace at which documents were be reviewed or produced, he should contact the Court and request another status hearing. *Id.* 20:15-21.

---

[3] During the status hearing on January 9, 2001, the Defendants estimated that the 251 boxes might contain between 251,000 and 775,000 pages of material. 1/9/01 Tr. 4:15-23.

In a further status report submitted on February 5, 2001, the Defendants explained that the CIA had identified "numerous code words associated with Gehlen and the Gehlen Organization, and conducted a search of the applicable records systems using these code words," identifying "a potential universe of over 25,000 responsive documents." 2/5/01 Status Report, ECF No. [216] at 2. The CIA intended to conduct another search "within the next two months" using additional search terms. *Id.* at 3-4. The agency estimated that the review of all potentially responsive documents, including referrals to other agencies as necessary, would take two years to complete, "but because of the many variables, the CIA suggest[ed] that it provide interim status reports on the CIA's Progress every four to six months." *Id.* at 4. The Court did not issue any orders in response to the February 2001 status report. In fact, between February 2001 and December 2011, neither party submitted any documentation to the Court, save notice of change of addresses for counsel and notices of substitution of counsel for the Defendants.

Nearly eleven years after the Defendants' last status report, the Plaintiffs filed a motion to substitute Mr. DiBacco and Ms. Webster as Plaintiffs, which Judge James E. Boasberg granted in his capacity as the motions Judge. 12/1/11 Mot., ECF No. [224]; 1/5/12 Minute Order. The Plaintiffs then moved to compel the Defendants to, among other things, describe the searches conducted for potentially responsive documents, provide copies of all draft status reports created after February 2001, provide copies of all *Vaughn* indices submitted to the Plaintiffs since February 2001, "[l]ist and provide copies of all correspondence which was sent to Carl Oglesby or his attorney regarding this case subsequent to the February 5, 2001 status report," and "[l]ist and provide copies of all records released pursuant to this lawsuit subsequent to the February 5, 2001 status report." Pls.' Mot. to Compel, ECF No. [227]. Once the Plaintiff's motion was fully briefed, the case was randomly reassigned to the undersigned. 5/30/12 Reassignment of Civil

Case, ECF No. [237].  The Court promptly denied the Plaintiff's motion to compel, and ordered the parties to submit a proposed briefing schedule for dispositive motions.  5/30/12 Minute Order.  The Court adopted the parties' suggested schedule, and the motions are now ripe for consideration by the Court.

## II.  LEGAL STANDARD

Congress enacted the Freedom of Information Act, 5 U.S.C. § 552, in order to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (citation omitted).  Congress remained sensitive to the need to achieve balance between these objectives and the potential that "legitimate governmental and private interests could be harmed by release of certain types of information."  *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992) (en banc) (citation omitted), *cert. denied*, 507 U.S. 984 (1993).  To that end, FOIA "requires federal agencies to make Government records available to the public, subject to nine exemptions for categories of material."  *Milner v. Dep't of Navy*, 131 S.Ct. 1259, 1261-62 (2011).  Ultimately, "disclosure, not secrecy, is the dominant objective of the act."  *Rose*, 425 U.S. at 361.  For this reason, the "exemptions are explicitly made exclusive, and must be narrowly construed."  *Milner*, 131 S.Ct. at 1262 (citations omitted).

When presented with a motion for summary judgment in this context, the district court must conduct a "de novo" review of the record, which requires the court to "ascertain whether the agency has sustained its burden of demonstrating that the documents requested . . . are exempt from disclosure under the FOIA."  *Multi Ag. Media LLC v. Dep't of Agriculture*, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (citation omitted).  The burden is on the agency to justify its response to the plaintiff's request.  5 U.S.C. § 552(a)(4)(B).  "An agency may sustain its burden

by means of affidavits, but only if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Multi Ag Media*, 515 F.3d at 1227 (citation omitted). "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *Am. Civil Liberties Union v. U.S. Dep't of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011) (citations omitted). "Uncontradicted, plausible affidavits showing reasonable specificity and a logical relation to the exemption are likely to prevail." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011) (citation omitted). Summary judgment is proper when the pleadings, the discovery materials on file, and any affidavits or declarations "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). With these principles in mind, the Court turns to the merits of the parties' cross-motions for summary judgment.

## III. DISCUSSION

*A.      Miscellaneous Motions*

Over a month after filing their Opposition and Cross-Motion, and three days after submitting their Reply in support of their Cross-Motion, the Plaintiffs filed a motion seeking to compel the Defendants to disclose four *ex parte*, classified declarations submitted to the Court in support of the Defendants' 1997 renewed motion for summary judgment. Pl.'s Mot. to Compel at 1. The Plaintiffs cite no legal basis on which the Court may order the Defendants to declassify and disclose the declarations. Furthermore, the unclassified declarations submitted by the

Defendants in support of the same motion indicate the classified declarations were maintained in the possession of the United States Attorney's Office, but would be available to the Court for review at the Court's request. There is no indication that the Court ever sought to review the declarations or took possession of the classified declarations, and the Court never ruled on the Defendants' motion, which was subsequently withdrawn. On the present record, the unclassified declarations submitted on the issues identified in the Plaintiffs' motion to compel appear sufficient to enable the Plaintiffs to respond to the Defendants' motion for summary judgment. Absent any legal basis for ordering the Defendants to review and possibly disclose classified pleadings, the Plaintiffs' motion to compel is denied.

The Defendants have also moved for leave to file a surreply. The Plaintiffs do not oppose the motion, but have asked for additional time to file a response to the surreply. In light of the numerous arguments raised for the first time in the Plaintiffs' reply brief in support of their cross-motion—most if not all of which could have and should have been raised in their initial motion—a surreply from the Defendants would be useful to the Court in resolving the parties' dispositive motions. However, a further response from the Plaintiffs would be neither useful nor equitable. Therefore, the Defendants' motion for leave to file a surreply is granted, and the Court shall file the Defendants' proposed surreply in resolving the parties' cross-motions.

B.      *Parties' Cross-Motions for Summary Judgment*

The Defendants move for summary judgment regarding all outstanding issues as to the responses to Oglesby's FOIA request by the CIA, the Army, and the NSA. The Court begins with the Plaintiffs' objections to a report relied on by the CIA and the Army to explain how records were processed under the NWCDA. Turning to the claims against the CIA, the Court finds the CIA conducted an adequate search for records, and no genuine dispute remains as to the

10

CIA's use of certain FOIA exemptions to justify withholding certain information from the records produced to the Plaintiffs. With respect to the Army, the Court finds the Army's decision to transfer its records to the National Archives and Records Administration as part of NWCDA review process was not suspect, therefore the Army is entitled to summary judgment on the grounds it has not wrongfully withheld any responsive records. Finally, the Plaintiffs fail to raise a genuine dispute as to the adequacy of the *Vaughn* declaration submitted by the NSA. Accordingly, the Court grants summary judgment in favor of the Defendants on all outstanding claims.

Initially, the Plaintiffs take issue with the Defendants' reliance on the IWG Report to establish the scope of documents reviewed in connection with the NWCDA. Federal Rule of Evidence 803(8) provides, in relevant part, that a record or statement of a public office is not excluded under the rule against hearsay so long as the record (A) sets out the office's activities or a matter observed while under a legal duty to report, and (B) neither the source of information nor other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A)-(B). The Plaintiffs do not dispute that because the IWG Report was created pursuant to the group's legal obligation to report to Congress, the report satisfies the requirements of Rule 803(8)(A). Pub. L. 105-246 § 2(c)(3) (requiring the IWG to "submit a report to Congress . . . describing all such records, the disposition of such records, and the activities of the [IWG] and agencies under this section"). However, the Plaintiffs contend the report is unreliable because of the following statement from the cover letter accompanying the report:

> In order to avoid further delay of the release of this report, members of the IWG did not seek unanimous agreement on a single "official" version of their declassification effort. Instead, this report presents the larger issues that arose while affording participants an opportunity to present personal or institutional perspectives on issues important to them and to those whom they represent.

These appear in a separate chapter at the end of the report

IWG Report at v (Apr. 2007 Ltr. from A. Weinstein).   Nothing in this statement "raises concerns" regarding the trustworthiness of the report as the Plaintiffs suggest.   If an agency or IWG member disagreed with the description of the agency's response to the NWCDA provided in the report, they could address those issues in the final chapter report.   For example, Elizabeth Holtzman, one of the public members of the IWG, indicates that although the CIA was reluctant to declassify large swaths of documents, but "is not in full compliance with the law and is giving [the IWG] all the material [the IWG] believe[s] is relevant" under the NWCDA.   *Id.* at 93.   The Plaintiffs offer no other evidence to suggest the IWG Report description of the processing of documents by the Army or the CIA is not credible.   Therefore, the Court finds the IWG Report to be proper non-hearsay evidence pursuant to Rule 803(8).[4]

Citing Federal Rule of Civil Procedure 56(e), the Plaintiffs' also suggest the report cannot be used as evidence regarding the adequacy of the Defendants' searches because the report was not made under oath.   Pls.' Cross-Mot. at 19-20.   It appears the Plaintiffs intended to cite Rule 56(b)(4), which provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."   Fed. R. Civ. P. 56(b)(4).   Nothing in Rule 56 requires that evidence be submitted only in the form of an affidavit, so long as the evidence can be presented in a form that would be admissible at trial.

---

[4] In a footnote in their Reply brief, the Plaintiffs imply that certain statements in the IWG are not admissible because they are not "factual findings."  Pls.' Reply at 4 n.2.  The Plaintiffs appear to be referring to Federal Rule of Evidence 803(8)(A)(iii), which provides that in a civil case or against the government in a criminal case, "factual findings from a legally authorized investigation" are not barred as hearsay.  The Defendants do not rely on subsection (iii) to establish the admissibility of the IWG report, making the Plaintiffs' argument irrelevant.

1.      <u>Central Intelligence Agency's Search for Responsive Records</u>

"An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 390 (D.C. Cir. 1999) (citation omitted). "At summary judgment, a court may rely on [a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Ancient Coin Collectors Guild*, 641 F.3d at 514 (citation omitted). "The agency cannot limit its search to only one or more places if there are additional sources that are likely to turn up the information requested." *Valencia-Lucena*, 180 F.3d at 391 (citation omitted). Ultimately, the adequacy of a search is "determined not by the fruits of the search, but by the appropriateness of [its] methods." *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003) (citation omitted).

A five person team from the CIA conducted a page-by-page review of 1.2 million pages of OSS records, that is, records from the wartime and immediate post-war period. Defs.' Ex. D (IWG CIA Excerpt) at 45. The CIA "opened its OSS records in their entirety," and consulted with foreign governments to clarify the sensitivity of foreign government information rather than automatically withholding such information, as was the CIA's usual practice. *Id.* Utilizing search terms suggested by historians and staff from the CIA and IWG, as well as interviews with former OSS and CIA personnel, the agency also conducted searches of electronic and manual indices of the CIA-era records (post-1947). *Id.* The CIA conducted a line-by-line declassification review of the relevant files, and conducted further searches based on information located within the files being reviewed. *Id.* at 45-46. Prior to 2005, the CIA utilized a narrow definition of relevance, and "maintained that files were subject to the act[] only if they contained

13

either direct information about war crimes or information suggesting that there were grounds to believe that the subject was involved in war crimes, acts of persecution, or looting." *Id.* at 47. Under this approach, the CIA declassified and released approximately 50,000 pages of documents. *Id.* at 49. However, in February 2005 the CIA shifted course, and agreed to, among other things, "[d]eclassify information on individuals connected to the Nazis whether war criminals or not," "[d]eclassify and release operational project files where Nazis were involved," and "[u]ndertake additional searches that the IWG historians or CIA thought necessary." *Id.* at 50. As a result, the agency revised the redactions to 47,400 pages, and released over 65,000 new pages. *Id.* All told, the agency released approximately 114,200 pages of CIA-era records. Defs.' Ex. E (First Lutz Decl.) ¶ 13.[5] On May 14, 2012, the CIA provided plaintiffs' counsel with seven disks containing all CIA records released pursuant to the NWCDA. *Id.* ¶ 12. The cover letter provided with the disks explained how the records were organized and identified where on the disks records relating to Reinhard Gehlen and the Gehlen Organization's relationship to the United States Government could be located. *Id.*

In order to comply with the NWCDA, the CIA conducted a search for records far more expansive than searches usually undertaken in responding to FOIA requests. All directorates were instructed to search for relevant documents, using both name and codeword searches. For example, with respect to documents concerning General Gehlen, the CIA searched for files retrievable by name, in addition to conducting searches for codewords, aliases, and cryptonyms for Gehlen and his organization. First Lutz Decl. ¶ 16. Ultimately the CIA released approximately 2,100 pages of material relating to Gehlen. *Id.* ¶ 17. Ms. Lutz avers that, based

---

[5] Martha Lutz is the Chief of the Litigation Support Unit for the Central Intelligence Agency. First Lutz Decl. ¶ 1.

on the breadth and thoroughness of the CIA's search for responsive documents, the searches performed in response to the NWCDA were reasonably calculated to discover any records responsive to Oglesby's request. *Id.* ¶ 18.

The Plaintiffs raise a number of objections to the search performed by the CIA, none of which have merit. First, the Plaintiffs note that in its December 11, 2000, status report, the CIA explained that it anticipated locating documents potentially responsive to Oglesby's request that were beyond the scope of the NWCDA. 12/11/00 Status Report at 2. Ms. Lutz explains that this statement was based on CIA's initial, narrow interpretation of its obligations under the NWCDA insofar as the CIA believed it would not be required to produce documents relating to General Gehlen under the NWCDA because General Gehlen is not considered a war criminal. Defs.' Reply Ex. D (Second Lutz Decl.) ¶ 4. In 2005, the CIA elected to review and declassify information regarding *all Nazis* (not just war criminals), including operational files concerning those Nazis. *Id.* (emphasis added). "As a result, all Gehlen related records responsive to Oglesby's request fell within the scope of NWCDA and all were released in whole or in part under the NWCDA and provided to Plaintiffs." *Id.* The Plaintiffs fail to raise a genuine issue of material fact with respect to the scope of Oglesby's request vis a vis the CIA's release of documents pursuant to the NWCDA.

Second, the Plaintiffs take issue with the fact that the Lutz Declaration does not explicitly indicate that the records of all directorates were searched. Pls.' Cross-Mot. at 30-31. Ms. Lutz explained in her initial declaration that "[a]ll CIA records are maintained by one of four directorates and the independent offices and other entities under the Director, Central Intelligence Agency (D/CIA): the National Clandestine Service (NCS), Directorate of Intelligence (DI), Directorate of Science and Technology (DS&T), Directorate of Support (DS),

and the Director's Area." First Lutz Decl. ¶ 14. "*All* directorates were tasked to search for such

records, with the CIA's Nazi War Crimes Task Force overseeing the search and review of these

records." *Id.* ¶ 15 (emphasis added). Moreover, the NWCDA

> expressly precluded agencies from invoking Sec. 701(a) of the National Security
> Act of 1947, as amended, which exempts operational files designated by the
> Director of the CIA from the search and review requirements of the FOIA. Thus,
> CIA's records search under the NWCDA included searches of all operational files
> reasonably likely to contain responsive information. Indeed, the majority of the
> records located were from operational files.

Second Lutz Decl. ¶ 7. Thus, the Plaintiffs' argument lacks merit.

Third, the Plaintiffs argue that the CIA's failure to release any documents regarding

meetings between the United States and General Gehlen at Fort Hunt demonstrates the CIA's

search was inadequate. Pls.' Cross-Mot. at 15-16. To be clear, Oglesby did not request *all*

records concerning Fort Hunt; rather he requested only "records on meetings held at Fort Hunt,

Virginia, in the summer of 1945 between General Gehlen and U.S. Army General George Strong

and Office of Strategic Services ("OSS") officer Allen Dulles." The D.C. Circuit addressed this

precise argument:

> Appellant also contends that the search was unreasonable because the agency did
> not find responsive documents that appellant claims must exist, namely,
> documents concerning the meeting at Fort Hunt. However, appellant provides no
> proof that these documents exist and his own conviction that the Fort Hunt
> meeting was of such importance that records must have been created is pure
> speculation. Such hypothetical assertions are insufficient to raise a material
> question of fact with respect to the adequacy of the agency's search.

*Oglesby I*, 920 F.2d at 68 n.13. The only new evidence[6] proffered by the Plaintiffs is two articles

---

[6] The "evidence" cited by the Plaintiffs for the proposition that transcripts of bugged
conversations from General Gehlen's quarters pre-dates *Oglesby I*, thus the Court assumes this
information was presented to the D.C. Circuit. Pls.' Cross-Mot. at 16. In any event, the
Plaintiffs failed to provide either of the documents cited on page 16 to the Court in connection
with the present motion practice.

published in 2006 and 2011, reporting that Fort Hunt was used as a secret prison camp where German scientists and soldiers were incarcerated and interrogated during World War II. Pls.' Ex. 4 (Petula Dvorak, *A Covert Chapter Opens for Fort Hunt Veterans*, Wash. Post, Aug. 20, 2006); Pls.' Ex. 5 (Emma Brown, *GWU Professor Extracted Nazi Secrets*, Wash. Post, July 19, 2011, at B5). Neither article supports the contention that documents regarding the specific meeting identified in Mr. Oglesby's request exist, and fall far short of creating a genuine issue of fact with respect to the adequacy of the CIA's search for documents.

Finally, the Plaintiffs argue the CIA should be required to conduct additional searches for the terms "Fort Hunt," "P.O Box 1142,"[7] and "GO," an abbreviation for the Gehlen Organization. As set forth above, the Plaintiffs failed to raise a genuine issue as to whether records exist regarding the specific meetings at Fort Hunt at issue in the Plaintiffs' request, thus there is no reason to believe searching for the terms "Fort Hunt" and/or "P.O. Box 1142" would be likely to locate additional responsive documents. Nor do the Plaintiffs offer any evidence to suggest a search for the term "GO" would uncover responsive documents not located by previous searches. Accordingly, the Court finds the CIA has met its burden to show that the agency's search was reasonably calculated to uncover all relevant documents.

### 2. Central Intelligence Agency's Withholdings

As the *Vaughn* index attached to Ms. Lutz's declaration indicates, the CIA withheld certain information pursuant to FOIA exemptions (b)(1) and (b)(3). *See* Attach. to First Lutz Decl. Counsel for the Plaintiffs objected to the CIA's Vaughn index on the grounds counsel was unable to correlate the entries on the index to the records provided to counsel. Pls.' Cross-Mot. at 40. Although the Defendants argue that the Plaintiffs could have utilized the initial Vaughn

---

[7] P.O. Box 1142 was the codename for Fort Hunt. *See* Pls.' Exs. 4, 5.

index using the letter that accompanied the disks containing the documents provided by the CIA. Defs.' Reply at 16-17. Nevertheless, the CIA provided a revised Vaughn index, including references to the relevant pdf numbers on the disks. Second Lutz Decl. ¶ 9. The CIA also provided a supplemental index addressing the 66 documents discussed by the Plaintiffs for the first time in their motion to compel. Defs.' Opp'n to Mot. to Compel, Ex. A (Fourth Lutz Decl.) ¶ 7. Therefore, the Court considers whether the CIA is entitled to summary judgment in light of the revised and supplemental *Vaughn* indices.

Exemption (b)(1) provides that agencies may withhold any information "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Exemption (b)(3) permits an agency to withhold information "specifically exempted from disclosure by statute (other than section 552b of this title)," if the relevant statute

> (A) (i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or
>
> > (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and
>
> (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

*Id.* § 552(b)(3). The Court addresses each of the exemptions in turn.

a. Exemption (b)(1)

The CIA identifies four categories of information that it contends is properly classified and thus exempt from disclosure under FOIA exemption (b)(1): (1) the true names of covert CIA employees; (2) names of clandestine human intelligence sources and information that could be used to identify clandestine human intelligence sources; (3) cities and countries in which the CIA

18

maintained covert installations; and (4) information regarding specific intelligence methods, including cover mechanisms.  First Lutz Decl. ¶ 29.  Ms. Lutz determined that the withheld information "is currently and properly classified" pursuant to Executive Order 12958, the Executive Order in effect at the time the CIA's NWCDA task force reviewed the documents and decided the information should remain classified.  *Id.* ¶ 21.  "Summary judgment may be granted on this issue on the basis of agency affidavits [only] if they contain reasonable specificity of detail rather than merely conclusory statements, and ... they are not called into question by contradictory evidence in the record or by evidence of agency bad faith."  *Public Citizen v. Dep't of State*, 276 F.3d 634, 644 (D.C. Cir. 2002).

The Plaintiffs contend that Ms. Lutz's declaration is insufficient to justify the agency's use of FOIA exemption (b)(1) because Ms. Lutz does not aver that the information is properly classified under Executive Order 13526.  Executive Order 13526, signed by President Barack Obama on December 29, 2009, currently governs classification decisions.  This Order defines "classified information" to include "information that has been determined pursuant to this order *or any predecessor order* to require protection against unauthorized disclosure."  E.O 13256 § 6.1(i).

> A district court may, upon request by an agency, permit the agency to apply a superceding [sic] executive order during the pendency of FOIA litigation. However, absent a request by the agency to reevaluate an exemption 1 determination based on a new executive order, the district court may not require the agency to apply the new order; instead, the court must evaluate the agency's decision under the executive order in force at the time the classification was made.  This rule prevents undue delay and burden in the resolution of FOIA claims by introducing an element of finality into agency decisionmaking.

*Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 29 (D.C. Cir. 1998) (citations omitted).  The *Campbell* court explained that the relevant question is whether the 2009 Executive Order "calls prior classification decisions under the [prior] Order into question."  *Id.*  Like the superseding

order in *Campbell*, Executive Order 13256 "does not permit FOIA litigants to reopen classification decisions finalized before the Order's effective date" because the superseding Order "defines classified information to include information classified under prior orders," and "does not contain any provision that requires an agency to reconsider classification decisions in pending FOIA litigation." *Id*.

The Plaintiffs cite *Campbell* for the proposition that "D.C. Circuit cases have consistently held that where a case has been remanded to [sic] district court, review should occur under the new executive order." Pls.' Cross-Mot. at 33. The *Campbell* court rejected the FBI's declaration as insufficient to justify its use of exemption (b)(1), and noted that

> In preparing a new declaration on remand, the FBI's new declarant . . . presumably must re-review the redactions and withholdings. This rule is consistent with our reasoning in *Lesar*: when an agency has completed a FOIA review, principles of finality weigh against ordering a new review under a new order, but when a court orders a new review on other grounds, respect for the President's authority to define national security priorities requires that the new review proceed under current law rather than the superceded law of a prior administration.

*Id.* at 31 (citing *Lesar v. U. S. Dep't of Justice*, 636 F.2d 472 (D.C. Cir. 1980)). Here, the D.C. Circuit did not instruct the Court to reevaluate the CIA's classification decisions upon remand. To the contrary, the D.C. Circuit upheld the CIA's application of exemption (b)(1) with respect to the documents listed in the *Vaughn* index, and only remanded the case to the extent the CIA failed to include certain documents in the index in the first place. *Oglesby II*, 79 F.3d at 1182-83.

For the first time in their Reply, the Plaintiffs suggest that Executive Order 13256 should govern the use of exemption (b)(1) in this case because *Ms. Lutz's* review of the documents took place while Executive Order 13256 was in effect. The D.C. Circuit explained

when an agency first receives a FOIA request, it may wish to reevaluate its initial classification decision to determine whether the materials requested require declassification or reclassification at a higher level, if circumstances so dictate. The agency looks to the procedures and substantive criteria contained in the Executive Order then in force rather than those found in the Executive Order under which the initial classification decision was made. On review, the court should also assess the documents according to the terms of the Executive Order under which the agency made its ultimate classification determination.

*Lesar*, 636 F.2d at 480. The agency made its ultimate determination regarding the documents at issue in this case between 2005 and 2007. Second Lutz Decl. ¶ 8. Thus, the question for the Court is whether the agency properly determined the information was classified and thus exempt from disclosure under the Executive Order in force during that time frame, namely Executive Order 12958. Ms. Lutz's declarations provides support for the agency's position, but the agency reached a final determination with respect to this information years before the litigation reached this stage.

With respect to the substance of the agency's application of exemption (b)(1), the Plaintiffs proffer only two arguments. First, the Plaintiffs argue that the agency failed to take into consideration "the passage of time."[8] The D.C. Circuit rejected this argument once before:

Oglesby has not demonstrated that an agency's national security concerns automatically disappear with the passage of time, and therefore has not rebutted the affidavits stating that the material had been reviewed at the time of the request, and had been determined to pose a current threat to national security if released.

*Oglesby II*, 79 F.3d at 1183. The Plaintiffs once again have "merely made the naked assertion that the passage of time renders the national security claims questionable." *Id.*

---

[8] Apart from the Plaintiffs' disagreement regarding what Executive Order controls the classification decision, the Plaintiffs fail to articulate how Ms. Lutz's declarations have been "controverted by contrary evidence." Pls.' Reply at 15.

> As long as an agency declares through its affidavits that the responsive material has been reviewed to assure the continuing accuracy of its original classification, and that a determination has been made that the withheld information still poses a security risk if released, the mere passage of time is not a per se bar to reliance on exemption 1.

*Id.* This is particularly true in this case, where much of the information withheld under exemption (b)(1) may expose locations and techniques still utilized by the agency. Second, for the first time in their Reply the Plaintiffs argue that the documents were not properly classified under Executive Order 12958 because they do not contain the classification markings required by section 1.7 of that Order. Pls.' Reply at 9. Section 1.7(f) of Executive Order 12958 specifically provides that "[i]nformation assigned a level of classification under this or predecessor orders shall be considered as classified at that level of classification despite the omission of other required markings." The documents at issue in this case were marked according to the requirements in place at the time the documents were initially classified, generally between 1951 and 1954. Third Lutz Decl., ECF No. [254-2], ¶ 9. Ms. Lutz's unrebutted declaration establishes with a reasonable level of specificity that the information at issue was properly classified and marked under Executive Order 12958, and thus was properly withheld under FOIA exemption (b)(1). Therefore, the agency is entitled to summary judgment on this issue.

### b. Exemption (b)(3)

Invoking FOIA exemption (b)(3), the CIA argues that it properly withheld certain information as provided by the National Security Act of 1947, as amended, 50 U.S.C. § 3024(i)(1), and the Central Intelligence Agency Act of 1949, 50 U.S.C. § 3507. The National Security Act provides that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). "The Director may

only delegate a duty or authority given the Director under this subsection to the Principal Deputy Director of National Intelligence." *Id.* § 3024(i)(3). The relevant provision of the CIA Act provides that the CIA shall be exempt from disclosing "the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency." 50 U.S.C. § 3507.

The Plaintiffs argue that because the National Security Act vests the power to protect intelligence sources and methods in the Director of National Intelligence, the CIA cannot rely on this statute to withhold information regarding intelligence sources and methods pursuant to FOIA exemption (b)(3). Judge Beryl A. Howell thoroughly analyzed this issue and ultimately rejected an identical argument in *Mobley v. CIA*, 924 F. Supp. 2d 24 (D.D.C. 2013). For the reasons stated by Judge Howell in *Mobley*, 924 F. Supp. 2d at 53, and as recognized by the D.C. Circuit in *Larson v. Department of State*, 565 F.3d 857, 862 (D.C. Cir. 2009), the Court finds that agencies other than the Director of National Intelligence may rely upon the National Security Act to withhold information regarding intelligence sources and methods pursuant to FOIA exemption (b)(3). The Plaintiffs do not otherwise challenge the CIA's use of exemption (b)(3). Based on the detailed description of the information withheld pursuant to this exemption provided in the First Lutz Declaration, the Court finds there is no genuine dispute that the CIA properly invoked FOIA exemption (b)(3) in this case.

### 3. Army's Search for Responsive Records

During the initial stages of this litigation, the Army produced an estimated 1,240 pages of information to Oglesby. *See generally* Third Nichols Decl., Attach. B., ECF No. [124].[9] Prior to the enactment of the NWCDA, the Army had transferred most of its World War II combat and

---

[9] Mr. Nichols, then the Chief of the Freedom of Information/Privacy Office for INSCOM, submitted the declaration in support of the Defendants' motion for summary judgment in 1997. Third Nichols Decl., ECF No. [124], ¶ 1.

operational documentation to NARA. Defs.' Ex. A (IWG Report, Army Excerpt) at 52. Thus, the Army's response to the NWCDA focused on the classified intelligence and counterintelligence records maintained by the Intelligence and Security Command ("INSCOM") Investigative Records Repository at Fort Meade, Maryland. *Id.* These "IRR" files generally concerned three topics: (1) "foreign personnel and organizations"; (2) "intelligence and counterintelligence sources"; and (3) "counterintelligence security investigations." *Id.* The records were comprised of 13,000 reels of 35mm microfilm (holding approximately 1.3 million files), and approximately 460,000 individual paper files, all of which had to be searched. *Id.* In order to process the documents,

> the Army scanned the microfilm to create digitized images of the files, which it then searched electronically for relevant files using the 60,000 Names List. The Army then reviewed and declassified the files identified as relevant and turned them over to the National Archives as digitized images. Simultaneously, IRR staff conducted a manual review of the files that the Army still maintained in paper form.

*Id.* at 54. Between 2000 and 2001, the Army provided NARA with over 20,000 digitized and paper files located in response to searches for individuals on the Names List. *Id.* "While the vast majority of the files were declassified in full, the Army had redacted limited portions, primarily foreign government information or intelligence sources and methods." *Id.* "After it finished digitizing its files, IRR staff undertook further searches as the IWG staff, IWG historians, and other participating agencies identified additional relevant names, projects, and operations that came to their attention during the course of their work." *Id.* The Army eventually transferred copies of all 1.3 million microfilm files to NARA. Defs.' Ex. B (Murphy Decl.) ¶ 12(d). The Army did not retain any copies of the files transferred to NARA. Defs.' Reply Ex. B (Second Dorris Decl.) ¶ 5.

Once the files were transferred to NARA, the NARA staff conducted searches using a

variety of keywords, outlined in paragraphs 13, 15, and 16 of the Declaration of Martha Wagner Murphy, the Chief of the Special Access and Freedom of Information Branch, Research Services, for NARA. Murphy Decl. ¶ 1. The searches did not locate any responsive records regarding the relevant meetings at Fort Hunt, *id.* ¶ 14, but NARA located a number of other responsive documents, which are listed in paragraph 17 of Ms. Murphy's Declaration. Ms. Murphy indicates that "electronic image files identified [in the declaration] are available for public inspection at NARA's headquarters," but if the Plaintiffs agreed to pay duplication fees, the files would be copied and mailed to the Plaintiffs. *Id.* ¶ 18. INSCOM also searched its remaining hard copy and electronic files but failed to locate any documents responsive to Oglesby's request. Defs.' Reply Ex. B (Second Dorris Decl.) ¶ 6.

The Plaintiffs argue the Army's search was inadequate, for two reasons. First, the Plaintiffs note that the declaration submitted by Bradley Dorris, the Director of the Freedom of Information Act/Investigative Records Repository Office at INSCOM, states that "[t]he records most likely responsive" to Oglesby's request would have been in the IRR at INSCOM, but does not state that *all* responsive documents were likely to be located at the IRR. Defs.' Ex. C (Dorris Decl.) ¶ 6. Mr. Dorris subsequently clarified that

> The records which would be responsive to the FOIA requests would have been in the Investigative Records Repository at INSCOM. However, all of these records were transferred to NARA. I am unaware of any other locations of any records related to the subject FOIA request. Due to the fact that the requested records were intelligence files in nature, the only location the documents would be located would be at INSCOM. INSCOM is the only Army intelligence records repository. The files would not be retained by any other Army agencies.

Second Dorris Decl. ¶ 7. The Plaintiffs suggest that Mr. Dorris's "credibility is damaged" due to the change in his supplemental declaration. Pls.' Reply at 4. If Mr. Dorris had submitted a new declaration merely parroting the relevant standard, the Court might agree that the supplemental

declaration would be insufficient. But Mr. Dorris's second declaration goes beyond mere recitation, and describes why, based on the nature of the information requested by Oglesby, any responsive documents would have been maintained in the IRR files transferred to NARA. The Plaintiffs offer no evidence to contradict or call into question Mr. Dorris's supplemental statement that any documents responsive to the Plaintiffs' request would likely be found in the IRR files.[10]

Second, the Plaintiffs argue that the Army's transfer of documents to NARA violated the Freedom of Information Act. "The FOIA provides a claimant with a remedy only against an agency that has 'improperly withheld' a record." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991) (quoting 5 U.S.C. § 552(a)(4)(B)). Thus, "[i]f the agency is no longer in possession of the document, *for a reason that is not itself suspect*, then the agency is not improperly withholding that document and the court will not order the agency to take further action in order to produce it." *Id.* (emphasis added). Here, the Army's transfer of documents is anything but suspicious. The NWCDA specifically ordered that agencies make relevant documents available to the public at the National Archives and Records Administration. Pub. L. 105-246 § 2(c)(1). The Army did not transfer only those documents potentially responsive to Oglesby's request, rather it transferred *all* combat and operational files related to World War II. Second Dorris Decl. ¶ 5. Moreover, NARA conducted an extensive search for responsive documents, and has made those documents available for the Plaintiffs to review or copy (at the

---

[10] The Plaintiffs note that Martha Murphy averred that "the most likely untapped location for finding Army documents responsive to the NWCDA" were the IRR files. Murphy Decl. ¶ 10. The scope of information to be reviewed under the NWCDA was broader than and in some ways distinct from the topics identified in Mr. Oglesby's request. Without more, Ms. Murphy's statement is not inconsistent with Mr. Dorris's averments regarding where documents responsive to Oglesby's request were likely to be located.

Plaintiffs' expense). This is not a situation in which the agency destroyed documents or otherwise made them unavailable to the requesting party. *Cf. Chambers v. Dep't of Interior*, 568 F.3d 998, 1004 (D.C. Cir. 2009) ("Thus, summary judgment is inappropriate, as the Government all but acknowledged, if, viewing all inferences in a light most favorable to Chambers, a triable issue exists as to whether Murphy (or any one [sic] else at Interior) intentionally destroyed the appraisal Chambers requested."). The fact that the Army produced over 1,420 pages of information to Oglesby prior to 1997 and did not transfer the IRR files to NARA until nearly sixteen years after the receipt of Oglesby's request undermines any suggestion that the transfer was motivated by a desire to avoid complying with the Army's statutory obligations under the FOIA. Drawing all inferences in favor of the Plaintiffs, no reasonable trier of fact could find that the Army destroyed or attempted to prevent the Plaintiffs from accessing documents relevant to Oglesby's request by transferring all World War II related files to NARA. The record indicates the motivation behind the Army's transfer of documents is not itself suspect. Therefore, the Army is entitled to summary judgment on the grounds it has not improperly withheld any records responsive to Oglesby's request.

### 4. National Security Agency's *Vaughn* Declaration

After conducting a search for potentially responsive documents, the National Security Agency identified fifteen documents containing information responsive to Oglesby's Request. *See generally* Defs.' Ex. G (Grantham Decl.) ¶¶ 14-42. Four of the documents were released in their entirety by the NSA to Oglesby, two documents were withheld in their entireties, one document was referred to the Army for review, and the remaining documents were produced with redactions. *Id.* In support of its motion for summary judgment following *Oglesby I*, the NSA submitted two declarations from Michael Smith, then the Director of Policy for the

National Security Agency, describing in very general terms the withheld information and the bases for the withholdings. Defs.' Ex. F (NSA Decls.) at 1-6, 13-16. The D.C. Circuit found Mr. Smith's declarations to be inadequate to justify the withholdings, noting that the declarations contain

> only sweeping and conclusory assertions that the agency withheld the documents because they contained material which could reasonably be expected to cause damage to national security. The affidavits offer no functional description of the documents; NSA has failed to disclose the types of documents, dates, authors, number of pages, or any other identifying information for the records it has withheld.

*Oglesby II*, 79 F.3d at 1183. The D.C. Circuit remanded the Oglesby's claim against the NSA to this Court, and indicated the Court "should order NSA to submit an index describing the documents to the greatest extent possible without disclosing information that must be protected." *Id.*

The NSA now submits a detailed declaration executed in February 1997 by Gary L. Grantham who at that time was the Acting Director of Policy for the NSA. Grantham Decl. ¶ 1. Mr. Grantham's declaration describes each of the fifteen documents in detail, including the number of pages, agency responsible for drafting the document, the title of each document (if applicable), and a detailed description of the factual information released and withheld from each document. *See*, *e.g.*, *id.* ¶¶ 17-19. Grantham's declaration identifies how many pages were found to be non-responsive, how many pages were withheld in their entirety, and how many pages were released in part. *E.g.*, *id.* ¶ 17. Finally, where appropriate, Grantham avers that the withheld information was properly classified pursuant to Executive Order 12958, and that release of the information could be expected to lead to the unauthorized disclosure of intelligence sources, methods, and foreign government information. *E.g.*, *id.* ¶ 19. The NSA also submitted a declaration from Diane M. Janosek, the Deputy Associate Director for Policy and Records for

the NSA, signed in December 2012. Defs.' Ex. H (Janosek Decl.) ¶ 1. Ms. Janosek explains that the information withheld from the documents at issue in the Grantham declaration, "was and remains currently and properly classified [] in accordance with [Executive Order] 13526." *Id.* ¶¶ 3, 20.

The Plaintiffs' opposition and cross-motion omits any reference to the Grantham declaration or the Defendants' motion for summary judgment with respect to the NSA's withholdings, and on that basis alone the Court may grant this portion of the Defendants' motion. *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F.Supp.2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."). For the first time in their Reply, the Plaintiffs raise four arguments in opposition to the NSA's motion, none of which are persuasive.

First, the Plaintiffs argue that the Grantham Declaration is inadequate because it does not contain a *Vaughn* Index. This argument is nonsensical. The Grantham Declaration attached to the Defendants' Renewed Motion for Summary Judgment filed on December 14, 2012, describes in detail each of fifteen documents identified by the NSA as containing information responsive to Oglesby's request. Second, the Plaintiffs further suggest the Grantham Declaration is insufficient because "the NSA has made other releases which appear to consist of documents not part of the [Grantham Declaration]." Pls.' Reply at 22. Specifically, the Plaintiffs point to a letter from the NSA to counsel for Mr. Oglesby dated January 17, 1992, which, as part of Oglesby's administrative appeal of the NSA's response to his request, explains that certain portions of a document have been withheld as non-responsive or as exempt. Pls.' Reply Ex. B (1/17/92 Ltr. & Attach.). The letter attaches eighteen pages with markings indicating certain

redactions were for non-responsive information, while other redactions omitted exempt information. *See generally id.* at 3-20. The pages come from at least two different documents, and on their face correlate with portions of documents 3 and 5 as set forth in the Grantham declaration. *Cf.* Pls.' Reply Ex. B at 4 (dated June 14, 1954) *with* Grantham Decl. ¶ 20; *cf.* Pls.' Reply Ex. B at 8 *with* Grantham Decl. ¶¶ 26-27. The Plaintiffs failed to proffer a sufficient basis from which the Court could conclude the Grantham declaration failed to reference any of the documents produced (even in part) to Oglesby.

Third, the Plaintiffs contend that the Grantham declaration is inadequate because it was signed in 1997 and thus does not establish that release of the withheld information *today* could reasonably be expected to cause damage to national security. Pls.' Reply at 22. This argument completely ignores the Janosek Declaration, executed in December 2012, which explains both that the withheld information is properly classified under the Executive Order that has governed classification since 2009, and that release of the information in the present could reasonably be expected to damage national security. Janosek Decl. ¶¶ 3, 20.

Fourth and finally, the Plaintiffs seem to suggest that the "'document-by-document' review performed by Grantham . . . is [inconsistent] with the rigors of the segregability analysis required." Pls.' Reply at 23. "An agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Hodge v. FBI*, 703 F.3d 575, 582 (D.C. Cir. 213) (citation omitted). "[E]ven if the agency establishes an exemption, it must nonetheless disclose all reasonably segregable, nonexempt portions of the requested record(s)." *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1167 (D.C. Cir. 2011) (citation omitted); *see also* 5 U.S.C. § 552(a)(4)(B). The agency is entitled to a presumption that it complied with the obligation to disclose reasonable segregable material. *Hodge*, 703 F.3d at 583. The Plaintiffs offer no

evidence to rebut Grantham's averment that all reasonably segregable information has been produced to the Plaintiffs. The fact that the "major redactions have been made" to some of the pages produced to Oglesby is not at all surprising given the subject matter of the documents; one could reasonably expect that details of the United States' signal intelligence would properly remain classified years after any particular document was created. Moreover, the Grantham Declaration reflects the fact that in reviewing the documents for purposes of drafting the declaration, Mr. Grantham determined additional information in four documents was segregable, and released it to Mr. Oglesby. Grantham Decl. ¶¶ 34, 36, 38, 40. The extent of the redactions itself is insufficient to overcome the presumption that the NSA complied with its segregability obligations. *Hodge*, 703 F.3d at 582.

In sum, the Grantham declaration adequately describes the documents the NSA determined contained information responsive to Oglesby's request, the nature of the documents, as well as the information released to and withheld from Oglesby. Combined with the Janosek Declaration's averment that the information remains properly classified as of the filing of the Defendants' present motion, and that release of the information reasonably could be expected to harm national security, the Court finds the NSA has adequately justified its withholdings.

## IV. CONCLUSION

For the foregoing reasons, the Court finds the Defendants are entitled to summary judgment on all remaining issues. In the context of complying with the Nazi War Criminal Disclosure Act, the CIA conducted an adequate search for records responsive to Oglesby's FOIA request. The Plaintiffs failed to create a genuine issue of material fact as to the adequacy of the CIA's *Vaughn* index, including the CIA's use of FOIA exemptions (b)(1) and (b)(3). The Army's decision to transfer all of its World War II related files from the Army's Intelligence and

Security Command's Investigative Records Repository to the National Archives and Records Administration was not suspect, and thus the Army did not wrongfully withhold any relevant documents. Finally, the Plaintiffs failed to create a genuine issue of material fact as to the adequacy of the *Vaughn* declaration submitted by the National Security Agency. Accordingly, the Defendants' [254] Motion for Leave to File Sur-Reply is GRANTED; the Plaintiffs' [249] Motion to Compel Disclosure of Ex Parte Declarations is DENIED; the Defendants' [240] Renewed Motion for Summary Judgment is GRANTED; and the Plaintiffs' [241] Cross-Motion for Summary Judgment is DENIED. An appropriate Order accompanies this Memorandum Opinion.


_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
UNITED STATES DISTRICT JUDGE